IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

**No. 20-7105**

————————————————

NOT YET SCHEDULED FOR ORAL ARGUMENT

————————————————

**J.T.,**
Appellant,

v.

**DISTRICT OF COLUMBIA**
Appellee.

————————————————

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————————————

**BRIEF FOR THE APPELLANT**

————————————————

Douglas Tyrka
Tyrka & Associates, LLC
7322 Churchill Rd.
McLean, VA  22101
(202) 332-0038
tyrka@tyrkalaw.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.* The Plaintiff below and Appellant here is J.T. The Defendant below and Appellee here is the District of Columbia. There are no amici.

B. *Ruling under review.* The Appellant appeals from an October 1, 2020 order (Howell, J.) denying her summary judgment in part and granting the Appellee summary judgment in part.

C. *Related cases.* This case has not been before any court except the district court below. There are no current related cases.

# TABLE OF CONTENTS

JURSIDICTIONAL STATEMENT……………………..…………………………1

STATEMENT OF THE ISSUES………………………..……………………………1

STATEMENT OF THE CASE.....................................................................................2

    Legal Framework…………………………………………………………........2

    Relevant Background……………………………………………………….5

SUMMARY OF THE ARGUMENT....................................................................14

STANDARD OF REVIEW....................................................................................15

ARGUMENT………………………………………………………………...18

I.     DCPS DENIED THE PARENTS PARTICIPATION IN THE
      DECISIONMAKING REGARDING THE 2018-2019 SCHOOL
      PLACEMENTS…………………………………………………………18

II.    DCPS FAILED TO PROVE THAT EITHER PLACEMENT WAS AN
      APPROPRIATE DISTANCE FROM V.T.'S HOME.................................26

      A.    There Is No Dispute that V.T.'s Disability Makes a Long Commute
            Intolerable. ..........................................................................................27

      B.    DCPS Did Not Prove that CSM Was Appropriate Despite the
            Commute Problem................................................................................29

      C.    DCPS Did Not Prove that Frost Was Appropriate Despite the
            Commute Problem. ..............................................................................31

      D.    The District Court's Sua Sponte Ruling that J.T. Could Not Object to
            the Commute Time Because His IEP Did Not Address It Contradicts
            the Law and Logic. ..............................................................................33

III.    DCPS FAILED TO PROVE THAT EITHER PLACEMENT PROVIDED
        THE QUIET ENVIRONMENT V.T.'S IEP PRESCRIBED…..……..……39

        A.    V.T. Required a Quiet Classroom, as His IEP Prescribed.................39

        B.    DCPS Did Not Provide Admissible Evidence that CSM Could
              Provide a Quiet Environment……......................................................43

        C.    DCPS Provided No Evidence that Frost Could Provide a Quiet
              Environment…....................................................................................48

IV.     NEITHER CSM NOR FROST COULD ENSURE THE CLASS SIZE
        PRESCRIBED IN V.T.'S IEP……………………………..…………49

        CONCLUSION………………………………………………………...51

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672 (4th Cir. 2007)……………………………………………………….…...19, 20, 23

*Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603 (7th Cir. 2004)……………...………………………………………………16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………..15

*\*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176 (1982)……………………………..………………...3, 16-18, 26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………………………..15

*Crawford v. Washington*, 541 U.S. 36 (2004)…………………….…………47

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017)…………………………………………………………………3

*Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 532 F. Supp. 2d 121 (D.D.C. 2008)………………………………………………………..5

*Hall v. Knott County Bd. of Educ.*, 941 F.2d 402 (6th Cir. 1991)…………………5

*Holman v. D.C.*, 153 F. Supp. 3d 386 (D.D.C. 2016)……………………………...5

*Honig v. Doe*, 484 U.S. 305 (1988)………………………………………..…2, 3

*Idaho v. Wright*, 497 U.S. 805 (1990)………………………………….…………47

*J. T. v. D.C.*, 983 F.3d 516 (D.C. Cir. 2020)………………………….…………8, 40

*J.T. v. D.C.*, No. CV 17-1319 (BAH), 2019 WL 3501667 (D.D.C. Aug. 1, 2019)…..8

*Kerkam v. McKenzie*, 862 F.2d 884 (D.C. Cir. 1988)……………………………16

*Kroot v. D.C.*, 800 F. Supp. 976 (D.C.C. 1992)……………………………………16

*Mary McLeod Bethune Day Academy Public Charter School v. Bland*, 555 F. Supp. 2d 130 (D.D.C. 2008)……………………………………………………...………..5

*Miener v. Missouri,* 800 F.2d 749 (8th Cir. 1986)…………………………………...5

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519 (D.C. Cir. 2019)…3-4, 37

*Reid ex rel. Reid v. D.C.*, 401 F.3d 516 (D.C. Cir. 2005)………..……….……..5, 16

*S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260 (3d Cir. 2003)……………………………………………………..………………..…18

*Scorah v. District of Columbia*, 322 F. Supp. 12 (D.D.C. 2004)…..…………..16, 18

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994)…………………………..………15

*Walker v. District of Columbia*, 157 F. Supp. 2d 11 (D.D.C. 2001)…………………5

*Werner v. Clarkstown Central School Dist.*, 363 F. Supp. 2d 656 (S.D.N.Y. 2005).19

*\*Z. B. v. D.C.*, 888 F.3d 515 (D.C. Cir. 2018)…………………………..…3, 29, 32, 36

———————————————————————

**\*** Authority upon which the Appellant chiefly relies.

## <u>Statutes and Regulations</u>

20 U.S.C. § 1400 *et seq*…………………………………………………….……………….2

20 U.S.C. § 1400………………………………………………………………...………..2

20 U.S.C. § 1401…………………………………………….…………………2, 26, 31

20 U.S.C. § 1414……………………………….…………….2-3, 18, 20, 25-26, 35-36

20 U.S.C. § 1415………………………………………4, 15-16, 20, 26, 32, 46, 50

Fed. R. Civ. P. 56(c)…………………………………………………………………14

Fed. R. Evid. 401(a)……………………………………………………………….32

34 C.F.R. § 300.101………………………………………………………………...2

34 C.F.R. § 300.116(b)……………………………………………………………33

34 C.F.R. § 300.325……………………………………………...…………19, 20, 25

34 C.F.R. § 300.512……………………………………………………………47, 50

D.C. Code Ann. § 38-2571.03(6)(A)…...…………………….4, 13, 16, 26, 29, 32, 48

S.Conf.Rep.No.94–455 (1975), U.S.Code Cong. & Admin.News 1975……..……16

**GLOSSARY**

DCPS                District of Columbia Public Schools

IDEA                Individuals with Disabilities Education Act

IEP                 Individualized Education Program

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it is an appeal from a final order of the district court.

The district court entered the final order on October 1, 2020. The Appellant filed a timely notice of appeal on October 21, 2020.

## STATEMENT OF THE ISSUES

1.      Whether, in violation of the Individuals with Disabilities Education Act ("IDEA"), the District of Columbia Public Schools ("DCPS") failed to include the parents of a V.T., a special education student, in decisionmaking regarding his school placements for the 2018-2019 school year.

2.      Whether DCPS proved that it had provided placements appropriately close to V.T.'s home.

3.      Whether DCPS proved that it had provided V.T. with the quiet classroom environment he required.

4.      Whether DCPS proved that it had provided the limited class size that he required.

1

## STATEMENT OF THE CASE

<u>Legal Framework</u>

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., guarantees "that all children with disabilities have available to them free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.101.

"The primary vehicle for implementing these congressional goals is the 'individualized education program' (IEP)…Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IDEA requires that the local educational agency provide an appropriate school placement to as part of a free appropriate public education. *See* 20 U.S.C. § 1401(9).

The IDEA requires that the local educational agency include the parents of a student with a disability in all decisionmaking regarding the student's IEP and placement, among other decisions. *See* 20 U.S.C. § 1414(d)(1)(B)(i) (parent

2

member of IEP team); *Honig*, 484 U.S. at 311 (IEP developed in meeting with

parents); 20 U.S.C. § 1414(e) (local educational agency must ensure that parents

are part of group making placement decision). "Congress placed every bit as much

emphasis upon compliance with procedures giving parents and guardians a large

measure of participation at every stage of the administrative process…as it did

upon the measurement of the resulting IEP against a substantive standard." *Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S.

176, 205–06 (1982).

In addition to meeting many procedural requirements, the local educational

agency must develop an education program that is appropriate, that is, "reasonably

calculated to enable a child to make progress appropriate in light of the child's

circumstances," *Endrew F.*, 137 S.Ct. at 1001; *quoted by Z. B. v. D.C.*, 888 F.3d

515, 519 (D.C. Cir. 2018). The Supreme Court has emphasized that "this standard

is markedly more demanding than…merely more than *de minimis*." *Endrew F.*,

137 S. Ct. at 1000 (internal quotation omitted).

The local educational agency "is responsible for ensuring that the IEP Team

both reviews the child's IEP to determine whether his or her annual goals are being

achieved, and also revis[ing] the IEP as appropriate to address a lack of progress,

the results of updated evaluations or tests, and any anticipated needs. *Olu-Cole v.*

3

*E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 523 (D.C. Cir. 2019) (internal

quotations and brackets omitted); *see* 20 U.S.C § 1414(d)(4)(A).

Congress has afforded parents several procedural safeguards, including the

right to an administrative "due process hearing." *See* 20 U.S.C. § 1415(f). Due

process rights at the hearing include the right to counsel and the right to confront

and cross-examine witnesses. *See* 20 U.S.C. § 1415(h).

"Any party aggrieved by the findings and decision" at a due process hearing

has the right "to bring a civil action with respect to the complaint presented...in a

district court of the United States without regard to the amount in controversy." 20

U.S.C. § 1415(i)(2)(A).

In an IDEA due process hearing in the District of Columbia regarding "the

appropriateness of the child's individual educational program or placement, or of

the program or placement proposed by the public agency, the public agency shall

hold the burden of persuasion on the appropriateness of the existing or proposed

program or placement; provided, that the party requesting the due process hearing

shall retain the burden of production and shall establish a prima facie case before

the burden of persuasion falls on the public agency." D.C. Code Ann. § 38-

2571.03(6)(A).

As part of their relief, parents may obtain compensatory education. "Where a

school system fails to provide special education or related services, a student is

4

entitled to compensatory education." *Walker v. District of Columbia*, 157 F. Supp.

2d 11, 30 (D.D.C. 2001); *citing Hall v. Knott County Bd. of Educ.*, 941 F.2d 402,

407 (6th Cir. 1991); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986); *quoted

by Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 532 F.

Supp. 2d 121, 123 (D.D.C. 2008); *Mary McLeod Bethune Day Academy Public

Charter School v. Bland*, 555 F. Supp. 2d 130, 135 (D.D.C. 2008); *Holman v.

D.C.*, 153 F. Supp. 3d 386, 390 (D.D.C. 2016). Compensatory education consists

of prospective services "reasonably calculated to provide the educational benefits

that likely would have accrued from special education services the school district

should have supplied in the first place." *Reid ex rel. Reid v. District of Columbia*,

401 F.3d 516, 521 (D.C. Cir. 2005).

Relevant Background

      J.T.'s son V.T. is a young boy in the District of Columbia Public Schools

("DCPS") system who suffers from a significant autism spectrum disorder that

affects all aspects of his education and requires that he be educated in a very

restrictive environment with many accommodations. *See, e.g.,* JA 105-135. V.T.

requires, among other accommodations, a maximum class size of six students and

"minimal risk of noise and distraction from inside and outside the classroom." JA

125, 327-328 (providers proposing fewer than six students). Additionally, because

of V.T.'s disability – specifically his sensory processing disabilities – and because

of motion sickness, V.T. cannot tolerate road trips longer than several minutes. *See* JA 529-31, 585-91.

V.T.'s parents have been fighting for V.T.'s appropriate special education since before July 2015, when they filed their first administrative due process complaint. *See* JA 221. On the basis of that complaint, a hearing officer issued a decision holding that DCPS had denied V.T. an appropriate education and ordering DCPS to perform evaluations of V.T., to develop an IEP for him, to determine an appropriate school placement for him, to reimburse his parents for the cost of his private education at Kingsbury Day School ("Kingsbury"), and to fund his attendance at Kingsbury until DCPS fulfilled its other obligations. *See* JA 229-237.

After DCPS conducted the ordered evaluations of V.T., DCPS convened a meeting in February 2016, ostensibly to develop an IEP with the parents. *See* JA 246. However, after presenting its proposal for the IEP, DCPS explicitly refused even to listen to the parents' requests and opinions because they were presented through their attorney. *See* JA 246-47, 253-56. V.T.'s parents filed a new due process complaint on that basis, and won a decision requiring a new, complete IEP meeting and substantially reimbursing the parents for the expense of continuing to educate V.T. at Kingsbury. *See* JA 261.

DCPS convened another meeting in August 2016, but despite the last decision, DCPS continued to take a very adversarial stance against the parents and

6

their counsel and to restrict J.T.'s full participation in decisionmaking. As a hearing officer later put it, "DCPS staff approached the…meeting as though they were there only to answer questions and provide information." JA 270. At the meeting, DCPS again "refused to accept that Parent wanted her counsel to speak for her," though they had no reason to doubt that counsel was representing the parents' interests. JA 269.

DCPS did issue another IEP, without meaningful parental participation, but it was substantially the same as the one that it had created months before. *See* JA 267-68 ("only 1 word is different…the change of 'or' to 'and'" regarding a relatively minor point); JA 285 ("notwithstanding all the efforts of Parent and her counsel at the 8/24/16 meeting…[V.T.]'s 8/31/16 IEP is no better than his previous IEP, which [was] found to be insufficient").

The parents filed a new due process complaint, and in April 2017 the third hearing officer to preside over a hearing for V.T. again found that DCPS had denied V.T. an appropriate education by failing to fully consider his needs in developing the IEP. *See* JA 279-86. Again, DCPS was ordered to convene an IEP meeting and to seriously consider the parents' opinions regarding V.T.'s educational needs. *See* JA 289. The hearing officer again ordered most of the reimbursement sought for the ongoing attendance at Kingsbury, and ordered funding there for the rest of the school year as well. *See id*.

7

DCPS developed a new IEP in April 2017, and the parents challenged its appropriateness, as well as DCPS's failure to provide V.T. any school placement for the 2017-2018 school year. *J.T. v. D.C.*, No. CV 17-1319 (BAH), 2019 WL 3501667, at *2–3 (D.D.C. Aug. 1, 2019), *appeal dismissed in part*, No. 19-7136, 2020 WL 2050660 (D.C. Cir. Apr. 27, 2020), *and aff'd*, 983 F.3d 516 (D.C. Cir. 2020). Shortly before the hearing of that complaint, DCPS voluntarily agreed to fund V.T.'s continued attendance at Kingsbury. *See id.* The parents then received an adverse decision regarding the 2017 IEP and brought the dispute to the district court; this Court ultimately upheld the dismissal of the case as moot in because DCPS had issued a new IEP in 2018, as reviewed below. *See J. T. v. D.C.*, 983 F.3d 516, 518 (D.C. Cir. 2020).

In late May 2018, at the end of the school year, Kingsbury told the parents that the school would not accept V.T. back for the 2018-2019 school year. *See* JA 321-23.

In the summer of 2018, DCPS and the parents met to develop a new IEP, and for the first time agreed on its contents. *See* JA 105-35, 333-520. Relevant to this case, those contents include significant limitations on the size and noisiness of V.T.'s class. *See* JA 125 (maximum six students and "minimal risk of noise and distraction from inside and outside the classroom").

8

During the two-day meeting, DCPS did not discuss "what [] schools offered and how they can [meet] the IEP." JA 616-17 (DCPS witness testimony); *see* JA 27 ("school placements [were not] seriously discussed with plaintiff"). The IEP did not identify the location at which it would be implemented. *See* JA 105-35.

Sometime after the meeting, at DCPS's request J.T. visited Frost, with V.T. *See* JA 528, 532-540. Following that visit, one DCPS employee, Selena Barlow, made the decision to place V.T. at Frost, before consulting with the parents. *See* JA 526-27, 578.

Having made the decision, Ms. Barlow called J.T. directly to inform her of the decision, though Ms. Barlow knew that J.T., who is not a native English speaker, had repeatedly asked DCPS to communicate with the parents through counsel. *See* JA 59, 525, 569-70, 577; JA 246-47, 253-56, 269 (two prior decisions criticizing DCPS refusal to recognize J.T.'s counsel). After Ms. Barlow told J.T. that she had placed V.T. at Frost, J.T. informed Ms. Barlow that the parents disapproved of Frost as a placement, and asked Ms. Barlow to contact parents' counsel about the details. *See* JA 569-70.

Ms. Barlow declined to contact parents' counsel. *See id.* Instead, she simply issued the formal notice of the Frost placement by email that day, September 17,

2018.[1] *See id.*, JA 523. DCPS gave the parents no details in the notice regarding transportation to and from Frost. *See* JA 136, 523.

Parents' counsel responded to the notice with an email the next day generally stating that the Frost placement was substantively inappropriate and procedurally invalid. *See* JA 145. Counsel notified Ms. Barlow of the parents' intent to file a due process complaint regarding the placement if DCPS did not give any reason to hold off. *See id.*

Ms. Barlow responded with an email stating that she would like to hear J.T.'s concerns about Frost, and parents' counsel responded by saying that the parents were "happy to discuss the problems with Frost, but DCPS is forcing our hand by placing him there prior to that discussion." JA 143.

Ms. Barlow never responded to that communication. *See* JA 574-75. After waiting two business days for a response, parents' counsel sent Ms. Barlow an email detailing the parents' concerns about Frost, including the class size, the class noise, and the distance. *See* JA 145 (sent before business hours).

Before or after placing V.T. at Frost, DCPS never invited the parents to a meeting to discuss Frost, never discussed the Frost placement at any meeting, and

---

[1] DCPS informed the parents that V.T. could start Frost on September 24, 2018 at the earliest. *See* JA 523.

never held any meeting in which both Frost and the parents participated. *See* JA 527, 577.

On October 12, 2018, the parents filed a due process complaint regarding DCPS's failure to provide an appropriate placement and DCPS's "[f]ailure to determine a school placement via legal procedures designed to ensure full parental participation in decision making."[2] JA 70-73. The parents requested compensatory education relief and funding for home education until DCPS determined an appropriate placement. *See* JA 71-72.

On October 18, 2018, DCPS issued a new placement notice, to Community School of Maryland ("CSM"), a school which DCPS had never before mentioned.[3] JA 295. Again, DCPS declined to seek the parents' opinion of CSM before placing him there, though DCPS already knew that CSM was too far away, in the parents' opinion. *See* JA 578, 600, 602. Again, the notice gave no details regarding transportation. *See* JA 295.

On December 20, 2018, while the Frost complaint was still pending, the parents filed a due process complaint regarding the CSM placement, again alleging

---

[2] Before the district court, J.T. withdrew her claims regarding DCPS's failure to place V.T. for the first few weeks of the school year, before the Frost placement. *See* P's SJ Reply 25.

[3] CSM "is a department of…CSAAC[,]…Community Services for Autistic Adults and Children." JA 621. For unclear reasons, DCPS prefers to refer to the school as "CSAAC," so the transcripts include references to "CSM" and "CSAAC" interchangeably.

11

substantive inappropriateness and the failure to ensure parental participation. JA 204-07. The parents again requested temporary funding for home education and compensatory education relief. *See* JA 205-06.

Substantively, the Frost and CSM placements shared similar deficiencies as placements for V.T. Each school would require at least two hours of travel each day, even by the most direct route.[4] *See* JA 529 (60 minutes to reliably arrive for start of Frost school day, 45-60 minutes for trip home; JA 300 (CSM school day 9:30 a.m. to 3:30 p.m.); JA 301 (65 minutes to reliably arrive at CSM by 9:20 a.m.); JA 302 (45-75 minutes to return from CSM); JA 585 (confirming accuracy of CSM travel estimates). Even under ideal circumstances, that kind of commute is intolerable for V.T.; it would render him unable to participate in classes. *See* JA 528-29, 585-91.

Neither Frost nor CSM can ensure quiet in the classroom. When J.T. and V.T. visited the Frost classroom the noise, which including "screaming and yelling," "was quite overwhelming" to V.T. JA 534. The noise at CSM was a similar problem during their visit there. *See* JA 594, 596.

Neither school could guarantee the small class V.T. required. There was some dispute at the CSM hearing regarding the number of children currently in the

---

[4] Because DCPS gave no details regarding transportation, it is possible, arguably likely, that V.T. would have been on a bus with other students, making multiple stops.

proposed class, but the CSM representative testified that the class size might change to seven, and that CSM would not limit that maximum based any student's IEP. *See* JA 625-26, 632. In the Frost hearing, J.T. testified that there had been more than six students (including V.T.) in the Frost classroom when she visited. *See* JA 532-33. No witness from the school testified on the point, but shortly after the hearing, DCPS explicitly offered to place V.T. in a class of seven at Frost. *See* JA 640-41.

The same hearing officer decided the Frost and CSM complaints, ruling for DCPS on all issues in both decisions. *See* JA 52-69, 187-203. In each decision, the hearing officer ruled that the parents "did establish a prima facia case [regarding substantive inappropriateness]…shifting the burden of persuasion to DCPS, which met its burden." JA 64, 197-98; *see* D.C. Code Ann. § 38-2571.03(6)(A) (for appropriateness issue, agency bears burden of persuasion), *cited by* JA 64, 197. J.T. challenged both decisions, and the district court upheld them. *See* JA 13.

DCPS did not assign V.T. to any school for the 2019-2020 school year, and failed even to identify any school that it contended was an available, appropriate placement for that school year. *See* JA 48-49. Orders from a hearing officer and the district court together awarded V.T. compensatory education for the entirety of that school year.

13

## SUMMARY OF THE ARGUMENT

As a matter of policy, DCPS entirely excludes parents from its decision to select a particular school placement for a special education student. During the 2018-2019 school year, DCPS applied that policy twice to the family of V.T., a young student with autism and related severe disabilities. Without consulting V.T.'s parents first, a single DCPS employee alone decided to place V.T. first in one private school, then another. V.T's parents had never even heard of the second school before receiving the placement notice. The IDEA, which promotes collaboration in all areas, does not permit a school district to exclude parents from such a decision.

Neither of these placements unilaterally made by DCPS could meet V.T.'s needs. Their most glaring shared defect was their distance from V.T.'s home. Each school would have required a round-trip commute as long as three hours, which V.T.'s disabilities make impossible. In IDEA administrative hearings, DCPS did not dispute V.T.'s travel limitations, and simultaneously failed to carry its burden of proving that each school could have provided the quiet classroom and small maximum class size that V.T.'s IEP prescribes.

14

## STANDARD OF REVIEW

This Court reviews summary judgment decisions "*de novo*, applying the same standards as the district court." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

In general, summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, a trial court must draw all justifiable inferences in the non-moving party's favor, but the non-moving party may not rely on mere conclusory allegations, and "must present significant probative evidence tending to support" its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In a summary judgment motion, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Unlike in typical judicial review of administrative action, in suits filed under the IDEA following an administrative hearing the court bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). "The district court's standard of review under the IDEA is less deferential than that applied under the traditional substantial evidence test used in ordinary administrative review cases."

*Scorah v. District of Columbia*, 322 F. Supp. 12, 16 (D.D.C. 2004) (citing *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988) and *Kroot v. D.C.*, 800 F. Supp. 976, 981 (D.C. Cir. 1992)). The plaintiff must persuade the court that the hearing officer was wrong, and the court must explain its basis for ruling against the hearing officer. *See Kerkam*, 862 F.2d at 887.

 That said, "a hearing decision without reasoned and specific findings deserves little deference. *Reid*, 401 F.3d at 521. Moreover, regarding issues solely of statutory construction a hearing officer's interpretations are not even entitled to the minimal "due weight" afforded them in other cases. *See, e.g., Reid*, 401 F.3d at 521 (affording no deference to hearing officer's determination concerning "an issue of statutory construction, a pure question of law that courts review de novo."); *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 611 (7th Cir. 2004) ("On issues of law, the hearing officer is entitled to no deference.").

 Though it should not make a difference in this case, the District Court overstated the deference given hearing officer decisions. *See* JA 38.

 When Congress decided that the courts would review IDEA hearing officer decisions by the preponderance of the evidence, Congress specifically rejected a more deferential standard. *See Rowley*, 458 U.S. at 205, *citing* S.Conf.Rep.No.94–455, p. 50 (1975), U.S.Code Cong. & Admin.News 1975, p. 1503. The

16

preponderance of the evidence standard is consistent with Congress's designation

of a federal challenge as a "civil action" rather than an "appeal." 20 U.S.C. §

1415(i)(2).

In *Rowley*, after reviewing the statutory language, the Supreme Court

cautioned courts against "substitut[ing] their own notions of sound educational

policy for those of the school authorities which they review," noting that the

procedures for the federal civil action carried "the implied requirement that due

weight shall be given those proceedings."  *Rowley*, 458 U.S. at 206.

But in making these observations, the Court in *Rowley* discussed only

deference regarding "educational policy." *Id.*

> [C]ourts must be careful to avoid imposing their view of preferable
> educational methods upon the States. The primary responsibility for
> formulating the education…and for choosing the educational method…was
> left by the Act to state and local educational agencies in cooperation with the
> parents or guardian of the child.
> ***
> It seems highly unlikely that Congress intended courts to overturn a State's
> choice of appropriate educational theories in a [federal] proceeding[.] We
> previously have cautioned that courts lack the "specialized knowledge and
> experience" necessary to resolve "persistent and difficult questions of
> educational policy."

*Id.* at 207-08 (citation omitted). Nowhere in *Rowley* did the Court propose any

similar kind of deference regarding due process hearing procedure and specific

fact-finding.

17

Since *Rowley* the Courts of Appeal have struggled to put meaning to the phrase "due weight," which is absent from the statute and unexplained within *Rowley*. The courts of some Circuits have used the phrase to transform the preponderance of the evidence standard in the statute into something approaching abuse of discretion. *See S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

This Court has not gone nearly that far. To the contrary, the Court has emphasized that "[t]he district court's standard of review under the IDEA is less deferential than that applied under the traditional substantial evidence test used in ordinary administrative review cases." *Scorah*, 322 F. Supp. 12, 16 (D.D.C. 2004).

## ARGUMENT

## I.    DCPS DENIED THE PARENTS PARTICIPATION IN THE DECISIONMAKING REGARDING THE 2018-2019 SCHOOL PLACEMENTS

As the hearing officer and the district court agreed, the IDEA required DCPS to include V.T.'s parents in the decisions to place him at Frost and then CSM. *See* JA 66-67, 200-01 (hearing officer analysis); JA 30 (holding that parents had the right to participate in the two placement decisions); 20 U.S.C. § 1414(e) ("Each…agency shall ensure that the parents…are members of any group that

18

makes decisions on the educational placement").[5] Similarly, the law required DCPS to include V.T.'s parents in those school decisions because the decisions established the IEP "location," a necessary element of V.T.'s IEP. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VII); *A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672, 679-681 (4th Cir. 2007) (failure to identify school in IEP was substantive IDEA violation).

Regarding a private school placement specifically, "[b]efore a public agency places a child with a disability in…a private school or facility" like Frost or CSM, "the agency must initiate and conduct a meeting" and "must ensure that a representative of the private school or facility attends the meeting." 34 C.F.R. § 300.325; *see Werner v. Clarkstown Central School Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (holding agency placement to private school *per se* invalid because of failure to comply with regulation).

There is no dispute that DCPS failed to include the parents in the decisionmaking regarding each placement. Selena Barlow testified that she personally had decided each placement, alone, before even asking the parents their opinion. *See* JA 526, 578 (decided each placement); JA 527, 569, 577 (chose Frost before calling J.T., never invited parents to meeting regarding Frost, never

---

[5] J.T. presented a lengthy analysis of the law on this point in her summary judgment Reply. P's SJ Reply 5-21.

discussed Frost placement at meeting, and never held meeting with Frost and parent present); JA 528, 600 (never invited parents to meeting regarding CSM, discussed CSM placement at meeting, or held meeting with CSM and parent present). In fact, Ms. Barlow volunteered that DCPS assigns placements without first consulting parents as a matter of policy or practice. *See* JA 574-75 (DCPS first assigns a school, "then we can talk about [parental] concerns").[6] DCPS and the District have continued to defend the policy of categorically excluding parents from the choice of school. *See* JA 76, 209 (circumstances of school selection did not "entitle the parent to be involved in the decision making").

Whether one calls it a failure to include the parents in the placement decision (20 U.S.C. § 1414(e)), a failure to include them in the IEP location decision (20 U.S.C. § 1414 (d)(1)(A)(i)(VII)), and/or a failure to convene an IEP meeting with a representative of the private school present (34 C.F.R. § 300.325), DCPS's unilateral placements to Frost and CSM, made without any consultation with the parents at all, denied J.T. participation in decisionmaking and thereby denied V.T. a free appropriate public education. *See A.K.*, 484 F.3d at 679-681 (failure to

---

[6] After making each school placement, DCPS still declined to engage the parents in any discussion of their concerns. *See* JA 569-75, 577, 613 (regarding Frost, Ms. Barlow ignored J.T.'s request that DCPS contact parents' counsel about concerns, declined to convene meeting after reading the concerns in an email, and declined to substantively respond to written concerns); JA 143-45 (emails regarding Frost placement); JA 578-79, 600, 614-15 (DCPS never made any attempt to meet with the parent after learning of concerns about CSM).

identify school in IEP was substantive IDEA violation); 20 U.S.C. §
1415(f)(3)(E)(ii)(II) (procedural violations are denials of appropriate education
when they "significantly impede[] the parents' opportunity to participate in the
decisionmaking process").[7]

Regarding the Frost placement, the hearing officer simply ignored the fact
that DCPS had made the decision before ever asking the parents for their opinion.
*See* JA 67; JA 527, 569, 577 (DCPS decided on Frost before calling J.T., never
invited parents to meeting regarding Frost, never discussed Frost placement at
meeting, and never held meeting with Frost and parent present). Instead, the
hearing officer seemed to criticize J.T. for asking DCPS to contact her lawyer,
while ignoring the fact that DCPS then simply declined to do so. *See* 67; JA 569-
70 (DCPS ignored parental request to contact counsel); JA 525 (J.T. had repeatedly
asked DCPS to communicate through counsel).

Regarding the CSM placement procedure, the hearing officer noted that Ms.
Barlow had "acknowledged that she had not tried to initiate a meeting with Parent
about [CSM]," but the hearing officer excused that failure because Ms. Barlow
"did not expect a willingness" from the parent. JA 201. A DCPS employee's

---

[7] The presence of the participation requirement evinces Congress's belief that
meetings with parents may impact school districts' decisions, but it is worth noting
that the CSM representative noted at the hearing that in IEP meetings in the past he
had "heard things from [a student's] current or past providers that [led him] to
believe that [CSM] would not be appropriate." *See* JA 631.

untested expectations do not excuse DCPS from its legal obligations, but in any case, the parents had already shown a great willingness to make their concerns heard about Frost, only weeks before the CSM placement. *See* JA 143 ("We are happy to discuss the problems with Frost"); JA 145 (specifying concerns); JA 569-77, 613. Even were Ms. Barlow empowered to exclude the parents for that reason, no reasonable person could have concluded that J.T. would have been unwilling to meet to discuss possible placements.

In both of his decisions, the hearing officer also excused DCPS's exclusion of the parents from the placement decisionmaking because of alleged discussions of schools at the IEP meeting months before the placements. *See* JA 68, 202 (both stating, "[p]rocedural requirements were met by the consideration of educational placement at nonpublic schools being discussed at the July IEP meeting."). As the district court found, this "consideration" of schools never occurred. *See* JA 27.

As the hearing officer himself noted, DCPS never even mentioned CSM at any meeting before placing him there. *See* JA 55 (meeting discussion did not include "Second Proposed School," CSM); JA 27 ("CSM was never brought up at any meeting"). DCPS did mention Frost on the first day of the two-day IEP meeting, twice in passing, well before the team had even reached the discussion of the type of environment V.T. required. *See* JA 435, 440; *see* JA 27 ("DCPS alluded in passing to Frost"). DCPS never suggested that the team discuss possible

22

placements, never asked J.T. her opinion of schools, and never said a word about

whether any particular school could meet the IEP, which was at that time still far

from complete. *See* JA 333-520.

To the contrary, on the second meeting day Ms. Barlow repeatedly stated her

ignorance of the identity and details of V.T.'s next school.

> I can't say what the school will allow or not, honestly….I can't speak for
> whatever school[.]
> ***
> I don't know where we're headed as far as programs for schools.
> ***
> I can't dictate what a private school staff will do.
> ***
> And so, as we apply to schools, they—you know, their school population
> changes every year, you know? And so, as we get this application out,
> they'll know who's gonna be in their population, and we're coming before
> the school year this year. And so, hopefully, they would be able to tell us if it
> would be a good fit or not.

JA 469, 474, 477, 503. During that second day, the entire team repeatedly

discussed schools purely in the abstract and hypothetical.[8] *See* JA 461-520.

---

[8] Though J.T. did not specifically contest the IEP because of the absence of an
identified school, it may be worth noting that these are almost the exact
circumstances of *A.K.*, in which the Court of Appeals for the Fourth Circuit held an
IEP to be inappropriate for the failure to identify a school, though two schools had
been mentioned at the IEP meeting. *See* 484 F.3d at 676, 679, 681 ("Although
Sullivan mentioned during an IEP meeting that Kellar and Phillips would be
possible placements, the IEP team had never considered whether these particular
schools would be able to satisfy A.K.'s specialized needs.").

In her hearing testimony, Ms. Barlow readily acknowledged that the IEP team hadn't talked about "what schools offered and how they can [meet] the IEP." JA 616-17. As noted above, Ms. Barlow volunteered that DCPS assigns placements without first consulting parents as a matter of policy or practice. *See* JA 574-75 (DCPS first assigns a school, "then we can talk about [parental] concerns"). Similarly, in the hearings DCPS counsel consistently maintained that the circumstances of these school placements did not "entitle the parent to be involved in the decision making." JA 76, 209.

The district court, while finding the indisputable fact that "school placements [were not] seriously discussed with plaintiff" at the meetings, nonetheless held that "this was not a serious deprivation" of the parents' right to participate. JA 27, 32. The district court so held because J.T. had "had substantial opportunity to participate—and did participate—in the July 2018 IEP meeting," and because she had had the opportunity to visit the schools. JA 32-34. But as the district court itself noted, "[a]lthough [J.T.] was substantially involved in the 2018 IEP meeting, and school selection was briefly discussed…there appears not to have been serious discussion on the matter and CSM was never even mentioned." JA 34.

While the school visits were "helpful in giving plaintiff firsthand exposure to the educational environments," such information does not equal participation in decisionmaking. JA 33. This is particularly true in the case of CSM, the placement

24

for the large majority of the year, which DCPS never even mentioned to the parents before notifying them that it had placed their son at the school. *See* JA 333-520 (meeting transcript); JA 578, 600 (DCPS witness testimony); JA 27 ("CSM was never brought up at any meeting"). Information acquired at that point contributed nothing to the parents' ability to participate in the decision already made. Even in the case of Frost placement, though J.T. had visited the school before DCPS's decision, DCPS decided to place V.T. there before even asking the parents' opinion. *See* JA 569. DCPS then declined to pull the placement to allow for a meeting with the parents. *See* JA 143-44, 574-75 (DCPS withdrew from communications).

When minimizing the denial of the parents' rights, over the course of its opinion the district court turned its lens solely on the requirement of a meeting with school personnel pursuant to 34 C.F.R. § 300.325(a), and lost sight of the broad need for parental participation in the placement decision. *Compare* JA 40 (the local educational agency "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement on their child.") (quoting 20 U.S.C. § 1414(e)) *with* JA 34-37 (discussing only 34 C.F.R. § 300.325(a)). It is true that, had DCPS offered the parents an opportunity to participate in the placement decisions before making them, its failure to comply with that more specific regulation would have had far

25

less consequence. The undisputed fact, however, is that "school placements [were not] seriously discussed with plaintiff, irrespective of whether a school representative was present." JA 27.

"Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process…as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205–06. DCPS's denial of that participation did not only "abridge[e] [J.T.'s] ability to understand how Frost and CSM would specifically be able to implement V.T.'s IEP." JA 32. DCPS's exclusion of the parents did more than "significantly impede[] the parents' opportunity to participate in the decisionmaking process." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). DCPS completely denied the parents "members[hip] [in the] group that ma[de] decisions on the educational placement on their child." 20 U.S.C. § 1414(e).

## II.    DCPS FAILED TO PROVE THAT EITHER PLACEMENT WAS AN APPROPRIATE DISTANCE FROM V.T.'S HOME

Because the parents met their burden of production in each case regarding the substantive inappropriateness of each school, DCPS needed to prove that each placement was appropriate for V.T. *See* JA 64, 197-98 (production burden met); D.C. Code Ann. § 38-2571.03(6)(A) (for appropriateness issue, agency bears burden of persuasion); 20 U.S.C. § 1401(9) (free appropriate public education

26

includes schooling). DCPS provided no evidence regarding the "key issue" of V.T.'s inability to travel long distances, and thus failed to prove that this "serious barrier" could be overcome with regards to either placement. JA 65, 198 (hearing officer characterizations of issue).

### A.     There Is No Dispute that V.T.'s Disability Makes a Long Commute Intolerable.

The hearing officer acknowledged in each case that travel to the school would pose a great challenge to V.T. because of his disabilities. *See* JA 65 ("serious concerns," "serious barrier," and "serious problem" regarding Frost); JA 198 ("key issue" regarding CSM); JA 193 (J.T. "had to stop several times" during the trip to CSM). There is no dispute that V.T. has enormous difficulty tolerating motor transportation for anything more than a short distance, stemming from a combination of his severe sensory processing disability and simple motion sickness.

A car trip of approximately an hour, as either Frost or CSM would require twice a day, is "very difficult." JA 529; s*ee* JA 301-02, 585. V.T. "cannot handle" such trips because he has "very strong [sensory processing] challenges to motion,"[9]

---

[9] J.T., who is not a native English speaker, has a significant accent that appears to have presented a problem in the transcription, as well as some grammatical deficiencies.

especially when there are "lots of people or lots of movements close by." JA 529; *see* JA 585-86 (stating the same and also noting motion sickness).

In response to those conditions, V.T. "tantrums, he gets very nervous, he [shakes], he cries, and he is very upset [] by the time [he arrives at] the schools." JA 586; *see* JA 529-30. When driving him a similar distance, V.T.'s mother must stop at least twice for 10-15 minutes each time, or V.T. "will get very sick…physically and emotionally." JA 587; *see* JA 529-30.

There is no dispute that V.T. would not be able to participate in school after an 80 to 85-minute trip as required for either school, even by car.[10] *See* JA 529; 587-89; JA 39 ("the difficulty of the morning commute, in particular, renders V.T. too upset to participate in school once he arrives"). A trip by bus, with other children, would simply be impossible. *See* JA 530-31 ("He won't be able to go to the bus with other people at all[.]"); JA 589-90.

DCPS offered no evidence in either hearing to dispute these facts. Moreover, DCPS never said anything about the manner in which V.T. would be transported to either school, so the situation could be far worse than the ideal – a car, with just a driver – as described by J.T. *See* JA 601 (DCPS has never provided transportation

---

[10] V.T. needs approximately one 10-minute break every 30 minutes. *See* JA 530, 587. The morning trip to Frost would normally be 60 minutes, or 80 minutes including breaks. *See* JA 529.  The morning trip to CSM would normally be 65 minutes, or 85 minutes including breaks. *See* JA 300-01, 585.

details because it takes no responsibility); JA 532, 584 (J.T. testimony); JA 614

(DCPS knew of transportation concerns before CSM placement). There is no

dispute that V.T. cannot tolerate the commute to either school.

### B. DCPS Did Not Prove that CSM Was Appropriate Despite the Commute Problem.

In the CSM case, regarding the bulk of the school year, the hearing officer

held CSM to be appropriate despite V.T.'s undisputed inability to tolerate the

commute because "special transportation concerns could be included on [V.T.]'s

IEP, which would be followed by OSSE in providing transportation, such as

adding an aide for [V.T.] on the bus, which could open a range of possible

solutions that Parent had not discussed with OSSE or DCPS."[11] JA 198.

The theoretical possibility that special transportation accommodations

"could be" added to V.T.'s IEP does not serve as evidence that CSM was an

appropriate placement at the time of the hearing. *See Z. B.*, 888 F.3d at 526 ("The

IDEA does not permit us to sustain an inadequate IEP because the school system

theoretically might bolster it."). That speculation contributed nothing to DCPS's

evidentiary burden of proving that CSM was appropriate. *See* D.C. Code Ann. §

38-2571.03(6)(A). DCPS presented no evidence to meet its burden of proving the

---

[11] OSSE is the Office of the State Superintendent of Education. DCPS and the District have never contested DCPS's liability for providing a free appropriate public education, including transportation, to V.T.

appropriateness of CSM regarding what the hearing officer identified as a "key issue." JA 198.

Moreover, even speaking hypothetically, the hearing officer suggested no specific solutions likely to solve the CSM commute problem.[12] Given the nature of V.T.'s disability, there is no reason to think that an aide, the hearing officer's one suggestion, would make the travel tolerable, when V.T.'s own mother cannot; no evidence was presented suggesting that an aide could help. Neither DCPS nor the hearing officer offered any suggestion of what other "possible solutions" could resolve the problem. There is no dispute that V.T. cannot tolerate the trip to CSM even under the best circumstances – a direct trip door-to-door, in his parents' car,

---

[12] In the CSM decision the hearing officer also noted that the parents had not requested modified transportation at the last IEP meeting. *See* JA 198. As reviewed above, modifications are not the issue because V.T. cannot tolerate a long trip even under ideal circumstances. Regardless, the absence of a discussion does not impact the question of whether CSM was an appropriate placement, so the hearing officer appears to be suggesting some kind of implied waiver, without any legal support for that idea. In any case, the hearing officer's contention that transportation was "a focus" of the IEP meeting is simply wrong; the word was only uttered twice in several hours of discussion, DCPS never asked about transportation concerns, and DCPS repeatedly stated that it could not give any meaningful information regarding any potential schools. *See* JA 333-520. Because specific schools were never discussed, there was never a call to discuss the distance problem, which had not been an issue with V.T.'s extant placement. *See* JA 60 ("Parent had driven Student to Previous School each day, which was about 10-15 minutes from home"). As soon as DCPS placed V.T. at a distant school without consulting his parents, his parents notified DCPS of the problem, a month before the CSM placement. *See* JA 145; Argument II.D.

30

with multiple breaks –so it is difficult even to imagine what adjustments could make it tolerable.

Regardless, DCPS simply did not present any evidence of extant accommodations to make the CSM commute possible.

### C.    DCPS Did Not Prove that Frost Was Appropriate Despite the Commute Problem.

In the Frost decision, regarding the placement for one month of the year, the hearing officer cited only V.T.'s "need for hugs and reassurance" during travel, missing the more significant issues with transportation, but nonetheless acknowledged that there were "serious concerns" about the commute. *Compare* JA 65 *with* JA 529-30 ("scream and yell and kick and has a severe tantrum," "cannot handle them"). However, he dismissed these concerns by citing what he called a "ready solution," that the "Parent would be willing to drive [V.T.] to school as long as the start time for [V.T.] could be adjusted, which would eliminate transportation as a concern." JA 55. The district court similarly credited this idea. *See* JA 40.[13] This "solution" is flawed in multiple ways.

---

[13] The district court did make clear whether the court understood that in any case, the testimony in question, and therefore the "solution," would only apply to the Frost placement, one month of the school year. *See* JA 198 (hearing officer distinguishing testimony in CSM case).

A "solution" of requiring a parent to drive over four hours each day so that her child can be educated is no such thing.[14] DCPS owes V.T. a free public education, which includes "transportation…as may be required to assist [him] to benefit from special education." 20 U.S.C. § 1401(26)(A); *see* JA 130 (prescribing transportation for V.T.). Neither DCPS nor the hearing officer could make V.T.'s education contingent on his mother driving him to and from school.

That enormous issue aside, even as the hearing officer constructed it, this "solution" would require that "the start time for the [V.T.] could be adjusted," but DCPS presented no evidence that such an adjustment was possible at Frost. JA 65. Again, by failing to present any evidence regarding this hypothetical solution, DCPS simply failed to meet its burden of proof on this issue. *See* D.C. Code Ann. § 38-2571.03(6)(A); *Z. B.,* 888 F.3d at 526.

Finally, the hearing officer should never have allowed DCPS to ask J.T. what she would be "willing" to do, and this Court should now dismiss that exchange from consideration. As counsel objected at the time, the question posed was not a fact question but a demand that J.T. take a position, and take it without the benefit of consulting counsel. *See* JA 546-47; Fed. R. Evid. 401(a) (relevant

---

[14] See footnote 10 regarding the morning trip of 60-85 minutes. The return trip from Frost would be 45-60 minutes, 65-80 with breaks. *See* JA 529. The morning trip to CSM would be 65 minutes, 85 with breaks. *See* JA 300-01, 585. The return trip from CSM would be 45-75 minutes, 65-95 with breaks. *See* JA 302, 585.

evidence "has a[] tendency to make a fact more or less probable");

https://www.merriam-webster.com/dictionary/fact ("a piece of information presented as having objective reality"); https://www.dictionary.com/browse/fact ("something said to be true or supposed to have happened…an actual or alleged event or circumstance"); https://dictionary.cambridge.org/us/dictionary/english/fact ("something that is known to have happened or to exist"); 20 U.S.C. § 1415(h)(1) (right to counsel). To the degree that the hearing officer then interpreted J.T.'s answer as a waiver of the IDEA right to transportation as part of a free appropriate public education, the hearing officer blatantly denied J.T. her IDEA right to the advice of counsel.

The specifics of the law aside, DCPS would force J.T. to drive over four hours per day, thereby preventing her from returning to work for years more, and would subject V.T. to the trauma of those same trips. *See* JA 598 (J.T. left work because V.T. was not in school). Such conditions could not be part of any appropriate education.

### D.    The District Court's Sua Sponte Ruling that J.T. Could Not Object to the Commute Time Because His IEP Did Not Address It Contradicts the Law and Logic.

The district court disregarded the undisputed impossibility of the long commutes primarily because the court held, sua sponte, that "[s]ince the IEP does not require that V.T.'s placement be within a certain distance of his home, DCPS

has not denied him a [free appropriate public education] by failing to place him at a close-in school." JA 39.  This holding contradicts the IDEA implementing regulations, ignores DCPS's various legal obligations, and leads to multiple absurd conclusions.

The district court's holding that a placement's distance from a child's home is only any issue if mentioned in the IEP directly contradicts 34 C.F.R. § 300.116(b), which separately requires that a "child's placement…(2) [i]s based on the child's IEP" and that it "(3) [i]s as close as possible to the child's home." Yes, a child's placement must be "based on the child's IEP," as the district court emphasized, but the regulations make clear that the distance from the child's home is an independent issue.

The clear regulation aside, the district court's reasoning leads to multiple absurd results. By its reasoning, DCPS could have placed V.T. in a school in Richmond, New York, or an even further location accessible by plane, because the IEP prohibits none of that. For that matter, were the court correct in its absolute principle that no placement may be held to be inappropriate other than in a way specified in the IEP, there was no requirement that V.T.'s school have electricity or heat, or that it teach classes in English. The district court, unbidden by the District of Columbia, has forwarded a principle that would require IEPs to be hundreds of pages long, lest they leave the student vulnerable to all kinds of absurdities.

34

The district court found it especially significant that commute distance was not mentioned in the transportation section of V.T.'s IEP. *See* JA 39, *citing* JA 190. DCPS plainly did not design that very small section of its IEP form to address commute distance. The section addresses four transportation questions: whether it is needed; why it is justified; what transportation mode will be used; and what transportation supports are needed. *See* JA 130. As is apparent, DCPS does not typically address commute distance in the transportation section of its IEPs, so by the district court's reasoning the typical special education student may be placed literally any distance from home.[15]

DCPS's practice of addressing only those limited transportation questions on the IEP explains why no one ever argued what the district court eventually held, that the parents' complaints about commute time were invalid because the IEP did not mention distance. DCPS personnel did not say so in response to counsel's email about the Frost commute problem; DCPS counsel never made the argument

---

[15] The form itself exhibits that DCPS does not address commute time in IEPs as a common practice. Had the district court brought this question to the parties instead of making its sua sponte judgment, J.T. would have presented testimony and documentary evidence regarding literally thousands of IEPs containing no mention of commute distance. *See John M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*, 502 F.3d 708, 713 (7th Cir. 2007) ("*[S]ua sponte* judgments are generally disfavored…[and] [a]t a minimum…proper only when the litigants have proper notice that the district court is contemplating entering such a judgment and have a fair opportunity to submit evidence prior to the entry of such a judgment[.]").

in any form in either hearing. *See* JA 145. The hearing officer (unfairly) criticized J.T. for not raising commute time at the IEP meeting – where schools were never discussed – but did not hold that J.T.'s claim was barred by the IEP. *See* JA 198. Following suit, the District did not so argue in its summary judgment briefing.

The district court's use of the IEP against V.T. and his parents also ignores DCPS's obligations to keep IEPs correct and current. Had it been true that this kind of concern belonged in the transportation section of the IEP, then DCPS would have been responsible for ensuring that the IEP team considered it. *See* 20 U.S.C. § 1414(d)(3)-(4); *Z. B.*, 888 F.3d at 523 ("The Act welcomes parental input, but specifically charges the evaluation of the student and the framing of an adequate IEP to the school."). In the IEP meeting, DCPS, who led the meeting, skipped right past the transportation section of the IEP without a word. *See* JA 515-16 (moving discussion directly from assessments section to extended school year section).

If the commute issues belonged on the IEP, DCPS evaded another opportunity to address them when it excluded the parents from the placement decisions. As reviewed earlier, DCPS's school placements determined the IEP "location," a necessary element of V.T.'s IEP. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VII). Had DCPS discussed this IEP change with the parents as the law requires, J.T. would have raised the commute problem, and DCPS could have amended the IEP, were that the "appropriate course of action." JA 39.

36

Moreover, if an intolerance of a long commute must be recorded on an IEP, the IDEA required DCPS to amend V.T.'s IEP in response to J.T.'s report of the issue. The IDEA requires DCPS to "revise[] the IEP as appropriate to address …information about the child provided to, or by, the parents" regarding "whether any additions or modifications to the special education and related services are needed," and as need to address "the child's anticipated needs…or…other matters." 20 U.S.C. § 1414(d)(4)(A), 1414(c)(1)(B); *see Olu-Cole*, 930 F.3d at 523. At the latest, J.T. alerted DCPS to the commute problem on September 25, 2018, one week after DCPS placed him at Frost, one month before the CSM placement, and several months before the decision regarding that placement.[16] *See* JA 145; JA 601, 614 (Selena Barlow aware of commute problem when making CSM placement). If the only "appropriate course of action would be to update V.T.'s IEP to include these transportation requirements," then DCPS has always been at fault for failing to amend the IEP to account for V.T.'s undisputed limitations and needs.[17] JA 39.

While misinterpreting the law and the IEP form, the district court took the IDEA's procedural protections for children and parents and turned them into

---

[16] Commute time was never an issue before because V.T.'s prior school was a 10-15 trip from his home, and J.T. therefore drove him. *See* JA 545.

[17] DCPS has not added any clause regarding commute time to V.T.'s IEPs since 2018.

obstructive procedural hurdles for V.T.'s family. DCPS deliberately refused to discuss the placement decision with V.T.'s parents, as a matter of policy. As soon as DCPS informed her of the Frost placement, J.T. alerted DCPS to the commute problem, but DCPS declined to address the problem and then placed V.T. at CSM, a similarly distant school that DCPS knew to be too far away. Despite these facts and the undisputed fact that the commutes would be impossibly traumatic, the district court held that this 8-year-old severely disabled child had no right to a school he could actually attend, because in the court's (incorrect) view the parents did not cross all of their Ts. Congress did not intend this use of the IDEA, even had the district court been technically correct.

> [A] child's entitlement to special education should not depend upon the vigilance of the parents…nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996).

DCPS has never disputed that V.T. cannot tolerate the commute to either school, which would "render[] V.T. too upset to participate in school once he arrives." JA 39. Because DCPS provided no evidence in either case that this issue could be overcome, DCPS failed to meet its burden of proving the placements appropriate for V.T.

### III. DCPS FAILED TO PROVE THAT EITHER PLACEMENT PROVIDED THE QUIET ENVIRONMENT V.T.'S IEP PRESCRIBED

To accommodate his severe sensory processing issues, V.T.'s IEP required that he be educated in a quiet environment, with "minimal risk of noise and distraction from inside and outside the classroom" and that "[i]nstruction and independent work time will be in a quiet area of the classroom." JA 125. There is no supported dispute that neither Frost nor CSM offered such an environment.

#### A. V.T. Required a Quiet Classroom, as His IEP Prescribed.

The 2018 IEP prescribed an environment with "minimal risk of noise and distraction from inside and outside the classroom," an important, unaddressed need for years. JA 125. In separate sentences, the IEP additionally specifically required that "[i]nstruction and independent work time will be in a quiet area of the classroom," that a rug will be on the classroom floor, and that noise-cancelling headphones will be available. *Id.*

Though neither DCPS, the District, nor the hearing officer had previously suggested so, the district court held that the first line requiring "minimal noise and distraction from inside and outside the classroom" did not constitute a general prescription of a quiet environment, that a rug and headphones alone were sufficient, and that J.T. was "quibbl[ing]" by arguing for a generally quiet environment. JA 41-42. To the contrary, the record leaves no doubt that V.T.'s

39

IEP team intended to generally prescribe a quiet classroom for him, independent of their prescription of more specific accommodations.

The simplest evidence that the 2018 IEP prescribes overall quiet – other than the plain language of the IEP itself – is the prior year's IEP. The 2017 IEP, which the parents challenged,[18] already contained the specific accommodations of a rug and headphones, but did not generally prescribe quiet inside the classroom. The 2017 IEP contained a paragraph identical to the one in question, with one exception: the 2017 IEP states, "To assist in decreasing noise, there needs to be minimal risk of noise and distraction from outside of the classroom," while the 2018 IEP states, "To assist in decreasing noise, there needs to be minimal risk of noise and distraction from *inside and* outside of the classroom." *Compare* JA 149 *with* JA 125 (emphasis added). The sentence is also moved to the beginning of the paragraph in the 2018 IEP. *See id.* The documents prove that the IEP team's intended to add a prescription of a quiet classroom, in addition to the rug and headphones the team had already prescribed in prior years.

Were there any remaining doubt, the record of the 2018 IEP meeting would resolve it. Over the two-day, several-hour meeting, the team repeatedly discussed V.T.'s extreme sensitivity to noise and distraction and its impact on all areas of his

---

[18] This Court ultimately held the dispute over that IEP to be moot. *See J. T. v. D.C.*, 983 F.3d 516, 518 (D.C. Cir. 2020).

education. *See* JA 333-520. When the team discussed the IEP section in question,

"Other Classroom Aids and Services," they negotiated the language used –

specifically the prescription of minimal classroom noise – at length. The discussion

of the need for a quiet classroom began as the team was discussing the maximum

class size.

| | |
|---|---|
| Male: | [T]wo very rambunctious kids would be worse than five calmer ones[.] |

***

| | |
|---|---|
| Male: | I think we have heard a pretty clear statement just now that is consistent with everything we've heard, which is that, at some level of noise and distraction from other kids, it becomes overwhelming. And that level can be just two kids if they are distracting enough[.] |

***

| | |
|---|---|
| Male: | And so, if we can say maximum six and a quiet classroom, then— |
| Female: | We do say that. |
| Male: | Well, no, it doesn't say quiet classroom, and that was— |

***

| | |
|---|---|
| Female: | So, under it, it does say "instruction and independent work time will be in a quiet area of the classroom, keeping noise down in the classroom, a rug needs to be there, teacher and adults in the classroom will speak in low, calm tones to the student." |
| Male: | Mm-hmm. And what has always been an issue with that paragraph is that it doesn't say anything about the other students. |
| Female: | Well, it does say, to assist in decreasing noise, there needs to be minimal risk of noise and distraction. |
| Male: | From outside the classroom. [Laughter] It very carefully says everything except for "noise from other children." |

***

| | |
|---|---|
| Male: | My concern on a legal basis is that, if he does end up in that situation, if he goes from here to a classroom of six kids and the other five are very noisy and boisterous and it's a total failure, we have nothing to complain |

41

about, because it fits his IEP…. [I]s there anybody, have we ever heard anybody who has provided services to [V.T.] say that he could be in a classroom with five other kids who were noisy and boisterous?...I haven't heard anything like that. And so, if we write an IEP that allows for that, that's an inappropriate IEP?

\*\*\*

Female:    [M]inimal risk of noise and distraction for inside and outside of the classroom.

Male:    Yeah, that's –

Female:    Would that make sense?

Male:    …The issue has always been not addressing quiet more globally….I would ask that it be the first sentence of this paragraph so that –

Female:    Mm-hmm.

Male:    …So, we'd be agreeing to maximum six [students] and then, 'to assist in decreasing noise, there needs to be a minimal risk of noise and distraction from inside and outside the classroom'?

Female:    Are we doing anything with the [student:teacher] ratio, just before we go past that?

\*\*\*

Male:    So, maximum six, take out the ratio, and then have that noise issue.

Female:    Yeah, yeah.

Female:    Mm-hmm.

Female:    Alright.

Male:    And we can move that sentence up to the [Cross talk]—

Female:    The first part.

Male:    The last sentence up to the first.

Female:    Mm-hmm[.]

42

JA 503-509. The meeting transcript leaves no question that the team added the requirement of "minimal risk of noise and distraction from inside…the classroom" thoughtfully, specifically to "address[] quiet more globally," and to protect V.T. from "noise from other children," which his disabilities do not allow him to tolerate. *Id.*

Finally, the longer litigation record shows that an overall quiet classroom has always been necessary. In 2017 decision, a hearing officer faulted DCPS for "refus[ing] to add a quiet instructional environment to [V.T.]'s IEP." JA 281; *see* JA 274 ("[V.T.] needs a very quiet space; he cannot be educated with noise, particularly screams or outbursts."). The hearing officer ordered DCPS to amend the IEP to "define to the extent possible a quiet setting that will help [him] progress." JA 290.

All evidence indicates that when prescribing "minimal risk of noise and distraction from inside and outside the classroom" and "[i]nstruction and independent work time…in a quiet area of the classroom," V.T.'s IEP team intended just that. JA 125.

### B.    DCPS Did Not Provide Admissible Evidence that CSM Could Provide a Quiet Environment.

In the CSM hearing, after J.T. testified that the CSM classroom was very noisy, Scott Murtha, the DCPS witness from CSM, acknowledged that the class

43

contained one student who "tend[s] to make a lot of non-verbal noises," and added that he did not "know how much of a problem that is for [V.T.]." JA 631, 633. Mr. Murtha also discussed the fact that one student has a voice output device, which V.T. cannot tolerate in a class environment. *See* JA 627, 634.

DCPS, which had the burden of proof on this issue, declined to ask Mr. Murtha whether the classroom offered "minimal risk of noise and distraction." *See* JA 621-25. In fact, DCPS notably avoided asking him such a question, after Mr. Murtha only testified that that the school could meet the IEP goals and objectives, which are in a different part of the IEP. *See* JA 623; *compare* JA 107-23 (goals and objectives section) *with* JA 125 (prescription of quiet within Other Classroom Aids and Services).

In his decision, the hearing officer reported that CSM "was aware of the requirements in [V.T.]'s IEP relating to noise and concluded that it could implement them," but Mr. Murtha never said that, and in fact indicated that he was unaware of V.T.'s severe intolerance. *See* JA 633 ("I don't know how much of a problem that is for [V.T.]"). Mr. Murtha certainly never testified that CSM could provide the prescribed quiet environment.

The district court stated that "[t]he DCPS Monitoring Specialist confirmed that CSM could satisfy the noise requirements of V.T.'s IEP," but the monitoring specialist familiar with CSM, Lauren Davis, never testified at the hearing. JA 41;

44

*see* JA 605-08, 617-18, 620. Over objection, DCPS presented only the testimony of Selena Barlow, about what another DCPS employee, Lauren Davis, had allegedly said. *See* JA 605-08, 617-18.

The district court dismissed this concern, saying that J.T. had only "infer[red] [that Ms. Barlow's] testimony must have been based on information provided her by another DCPS employee whom plaintiff did not cross-examine." JA 42. There was no inference; DCPS and Ms. Barlow were perfectly explicit that her understanding about CSM was based solely upon Ms. Davis's alleged statements.

[Barlow]:            [S]o I am not the monitoring specialist for [CSM], but I was able to talk with the monitoring specialist and knew from her observations what the classroom would look like for [V.T.] and if they'd be able to implement the IEP.

[DCPS]:            And what did you confirm by talking with her?
***
[Hearing Officer]: Can you get the monitoring specialist?

[DCPS]:            That's taking the requirement way too far.
***
[DCPS]:            [W]hat were you able to confirm after talking with the monitoring specialist at [CSM]?

[Barlow]:            Yes, I reviewed with her the IEP…[a]nd she was able to confirm with me that those accommodations and supplemental aids and services were available at [CSM].
***
[J.T.'s Counsel]:  [Y]ou haven't been to [CSM]? You don't know the teacher of the proposed classroom, do you?

45

| | |
|---|---|
| [Barlow]: | No, I do not. That's why, you know, I was assisted by the current monitoring specialist which is Lauren Davis. |

***

| | |
|---|---|
| [J.T.'s Counsel]: | You don't know how many of [the students] were verbal or nonverbal[?] |
| | |
| [Barlow]: | No[.] |
| | |
| [J.T.'s Counsel]: | You don't know how many of them are categorized as intellectually disabled as well as autistic, correct? |
| | |
| [Barlow]: | No, I do not know the classroom. |
| | |
| [J.T.'s Counsel]: | You don't know the size of the classroom, right? |
| | |
| [Barlow]: | I know the size of the classroom because I confirmed that with Lauren[.] |

***

| | |
|---|---|
| [J.T.'s Counsel]: | You don't know the physical size, correct? |
| | |
| [Barlow]: | No, I – as I stated earlier, I have not been to [CSM], I have not seen the classroom. |

***

| | |
|---|---|
| [Hearing Officer]: | And so there have been a number of concerns that were raised about [CSM], you know, in addition to transportation. And so in terms of whether the children in the classroom were verbal or not, is there any way to tell how those children…would have been in [V.T.'s] class? |
| | |
| [Barlow]: | That would have been for Lauren Davis to be able to answer that. I can't because I'm not the current monitoring specialist over there and so that really would be more a question for her. |
| | |
| [Hearing Officer]: | And same with the intellectual levels of the children? |
| | |
| [Barlow]: | Exactly, yes. |

***

| | |
|---|---|
| [Hearing Officer]: | And do you know if [CSM] is closer than Frost to the [family's] residence or further? |

46

[Barlow]:                I don't actually know the distance.

*Id.* During the discussion of J.T.'s objection, DCPS never contended that Ms.

Barlow had any basis for her testimony other than Ms. Davis's alleged statements,

and the hearing officer seemed to understand perfectly that Ms. Barlow had no

direct knowledge of the facts. *See id.* (J.T.'s counsel complaining that "she didn't

witness anything," and hearing officer responding, "So this is who we have it

seems.").

     Though it is unclear to what degree he relied upon them in the CSM

decision, the hearing officer should never have credited these alleged statements

from Ms. Davis to Ms. Barlow, and this Court should now disregard them, because

the IDEA guarantees each party "the right to…confront [and] cross-

examine…witnesses" like Ms. Davis. 20 U.S.C. § 1415(h)(2); *see* 34 C.F.R. §

300.512; JA 605-08 (objection and discussion). Congress of course borrowed this

language from the United States Constitution, which bars the introduction of such

"[t]estimonial statements of witnesses absent from trial…[except] where the

declarant is unavailable, and only where the defendant has had a prior opportunity

to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see Idaho v.*

*Wright*, 497 U.S. 805, 814 (1990) (clause applies even where hearsay rules do not).

     DCPS neither established Ms. Davis's unavailability or even asserted it, and

the parents had had no prior opportunity to cross-examine her. *See Barber v. Page*,

47

390 U.S. 719, 725 (1968) (party offering statement must establish unavailability);

JA 605 (DCPS declining to respond to hearing officer's question about Ms.

Davis's availability). Absent cross-examination of Ms. Davis at the hearing, it is

impossible to know the accuracy of Ms. Davis's alleged statements or the bases for

the statements, and it was impossible for the hearing officer to assess her

credibility. The fact that the CSM representative never testified that the proposed

class was quiet, and in fact testified to the contrary, makes Ms. Davis's statements

highly questionable. *See* JA 627, 631, 633, 634; *see also* JA 626 (Mr. Murtha

testifying that the CSM class had a maximum size of seven, larger that prescribed

by V.T.'s IEP).

The hearing officer should never have denied J.T.'s hearing rights and

allowed the testimony, but in any case, no witness testified in the hearing that CSM

could provide a quiet classroom for V.T. In the absence of such testimony, DCPS

failed to meet its burden of proving that CSM was appropriate. D.C. Code Ann. §

38-2571.03(6)(A).

### C.    DCPS Provided No Evidence that Frost Could Provide a Quiet Environment.

The noise in the Frost classroom "was quite overwhelming" to V.T. when he

visited. JA 534. "[I]n particular one kid [was]…screaming and yelling," which led

V.T. to "start[] reacting to him and yelling back." *Id.* The proposed class did not

offer "minimal noise and distraction" or any "quiet area." *See* JA 125; JA 537.

48

In the Frost hearing, no witness from the school testified. No witness at all testified that the Frost classroom offered "minimal risk of noise and distraction."

The hearing officer credited J.T.'s testimony that "the level of noise…[was] overwhelming," and acknowledged that "[n]oise was a big concern of [the] IEP." JA 65. Nonetheless, he ruled against the parents on this issue. *See* JA 65-66. Without addressing the burden on DCPS to prove that Frost offered minimal risk of noise and distraction, the hearing officer suggested that "the parties need to work through the issues and see what could be done to make the situation viable," and that "[a] trial period may have been necessary to see what [V.T.] could get used to as [V.T.] settled." *Id.*

The parents met their burden regarding Frost on this issue, and the hearing officer did not even suggest that DCPS had met its burden. This Court should therefore hold that Frost was inappropriate.

## IV.   NEITHER CSM NOR FROST COULD ENSURE THE CLASS SIZE PRESCRIBED IN V.T.'S IEP

V.T.'s IEP prescribed a "[m]aximum classroom size [of] 6 students." JA 125; *see* JA 327-28 (providers recommending a maximum of five). This was, as the hearing officer acknowledged, "a very important element of [V.T.'s] IEP." JA 65; *see* JA 198 ("an important element"); *see* JA 497-509 (negotiating class size and related issues at great length); JA 254 (prior decision holding that IEP that did not specify class size was "insufficiently clear").

49

Scott Murtha, the DCPS witness from CSM, testified that though V.T. would have been the sixth child in the proposed class, "if [V.T.]…were to attend the class…at some point a seventh child might be added to the classroom."[19] JA 626. Mr. Murtha also clarified that CSM would not limit that maximum size based on any student's IEP requirements. *See* JA 632. There is no dispute that CSM could not ensure an appropriately small class for V.T.

In the Frost hearing, J.T. testified that the class proposed for V.T. had already contained seven students when she had visited. *See* JA 532-33. No one testified to the contrary; no one from Frost testified at all. Instead, over the parents' objection Selena Barlow testified that Frost did not allow classes larger than six students as a matter of policy. *See* JA 563 (testimony); JA 560-62 (objections and discussion). As reviewed above, Argument III.B., the hearing officer denied the parents their IDEA right to cross-examine witnesses by crediting Frost's alleged statements regarding that school's policies in the absence of any testimony from Frost. *See* 20 U.S.C. § 1415(h)(2); 34 C.F.R. § 300.512; JA 65. This Court should now reject Ms. Barlow's testimony on these points as evidence.

---

[19] In the CSM hearing there was a factual dispute regarding how many students were currently in the class proposed for V.T., which dispute the hearing officer decided in DCPS's favor. *See* JA 198. Contrary to the district court's statements, J.T. has never contested that credibility ruling or relied on any witness other than Mr. Murtha regarding this issue. *See* JA 42-43.

Highlighting the unreliability of Mr. Barlow's testimony about Frost's policy, only six weeks after the decision in the Frost case, DCPS disproved its own position regarding Frost by offering to place V.T. in a class of seven students at Frost. *See* JA 640-41. Because DCPS offered no testimony regarding Frost that was based on direct knowledge and subject to cross-examination, DCPS failed to prove that Frost offered a sufficiently small class.

## CONCLUSION

DCPS denied V.T.'s parents participation in the placement decisions for the 2018-2019 school year, and in part as a result placed V.T. in plainly inappropriate schools. This Court should reverse the district court's partial summary judgment for the District, grant J.T. summary judgment on all remaining claims, and remand to the District Court to determine appropriate compensatory education relief.

Respectfully submitted,

/s/ Douglas Tyrka
Douglas Tyrka, #467500
Tyrka & Associates, LLC
7322 Churchill Rd.
McLean, VA  22101
(ph) (202) 332-0038
(f) (202) 332-0039
tyrka@tyrkalaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,110 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14 point.

Respectfully submitted,

/s/ Douglas Tyrka
Douglas Tyrka

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

20 U.S.C. § 1400…………………………………………………...………i

20 U.S.C. § 1401………………………………………..…………...……iv

20 U.S.C. § 1414……………………………………………….………ix

20 U.S.C. § 1415………………………………………………………xx

D.C. Code Ann. § 38-2571.03……………………………..………….xxxiii

34 C.F.R. § 300.101…………………………………………………xxvi

34 C.F.R. § 300.116(b)……………………………………………xxxvii

34 C.F.R. § 300.325…………………………………………………xxxviii

34 C.F.R. § 300.512……………………………………………..xxxix

Fed. R. Evid. 401(a)……………………………………………………xl

# Effective: October 5, 2010

20 U.S.C.A. § 1400

## § 1400. Short title; findings; purposes

**(a) Short title**
This chapter may be cited as the "Individuals with Disabilities Education Act".
**(b) Omitted**
**(c) Findings**
Congress finds the following:
**(1)** Disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.
**(2)** Before the date of enactment of the Education for All Handicapped Children Act of 1975 (Public Law 94-142), the educational needs of millions of children with disabilities were not being fully met because--
**(A)** the children did not receive appropriate educational services;
**(B)** the children were excluded entirely from the public school system and from being educated with their peers;
**(C)** undiagnosed disabilities prevented the children from having a successful educational experience; or
**(D)** a lack of adequate resources within the public school system forced families to find services outside the public school system.
**(3)** Since the enactment and implementation of the Education for All Handicapped Children Act of 1975, this chapter has been successful in ensuring children with disabilities and the families of such children access to a free appropriate public education and in improving educational results for children with disabilities.
**(4)** However, the implementation of this chapter has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities.
**(5)** Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by--
**(A)** having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible, in order to--
**(i)** meet developmental goals and, to the maximum extent possible, the challenging expectations that have been established for all children; and
**(ii)** be prepared to lead productive and independent adult lives, to the maximum extent possible;
**(B)** strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home;
**(C)** coordinating this chapter with other local, educational service agency, State, and Federal school improvement efforts, including improvement efforts under the Elementary and Secondary Education Act of 1965, in order to ensure that such children benefit from such efforts and that special education can become a service for such children rather than a place where such children are sent;
**(D)** providing appropriate special education and related services, and aids and supports in the regular classroom, to such children, whenever appropriate;
**(E)** supporting high-quality, intensive preservice preparation and professional development for all personnel who work with children with disabilities in order to ensure that such personnel have the skills and knowledge necessary to improve the academic achievement

and functional performance of children with disabilities, including the use of scientifically based instructional practices, to the maximum extent possible;

**(F)** providing incentives for whole-school approaches, scientifically based early reading programs, positive behavioral interventions and supports, and early intervening services to reduce the need to label children as disabled in order to address the learning and behavioral needs of such children;

**(G)** focusing resources on teaching and learning while reducing paperwork and requirements that do not assist in improving educational results; and

**(H)** supporting the development and use of technology, including assistive technology devices and assistive technology services, to maximize accessibility for children with disabilities.

**(6)** While States, local educational agencies, and educational service agencies are primarily responsible for providing an education for all children with disabilities, it is in the national interest that the Federal Government have a supporting role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law.

**(7)** A more equitable allocation of resources is essential for the Federal Government to meet its responsibility to provide an equal educational opportunity for all individuals.

**(8)** Parents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways.

**(9)** Teachers, schools, local educational agencies, and States should be relieved of irrelevant and unnecessary paperwork burdens that do not lead to improved educational outcomes.

**(10)(A)** The Federal Government must be responsive to the growing needs of an increasingly diverse society.

**(B)** America's ethnic profile is rapidly changing. In 2000, 1 of every 3 persons in the United States was a member of a minority group or was limited English proficient.

**(C)** Minority children comprise an increasing percentage of public school students.

**(D)** With such changing demographics, recruitment efforts for special education personnel should focus on increasing the participation of minorities in the teaching profession in order to provide appropriate role models with sufficient knowledge to address the special education needs of these students.

**(11)(A)** The limited English proficient population is the fastest growing in our Nation, and the growth is occurring in many parts of our Nation.

**(B)** Studies have documented apparent discrepancies in the levels of referral and placement of limited English proficient children in special education.

**(C)** Such discrepancies pose a special challenge for special education in the referral of, assessment of, and provision of services for, our Nation's students from non-English language backgrounds.

**(12)(A)** Greater efforts are needed to prevent the intensification of problems connected with mislabeling and high dropout rates among minority children with disabilities.

**(B)** More minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population.

**(C)** African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts.

**(D)** In the 1998-1999 school year, African-American children represented just 14.8 percent of the population aged 6 through 21, but comprised 20.2 percent of all children with disabilities.

**(E)** Studies have found that schools with predominately White students and teachers have placed disproportionately high numbers of their minority students into special education.

**(13)(A)** As the number of minority students in special education increases, the number of minority teachers and related services personnel produced in colleges and universities continues to decrease.

**(B)** The opportunity for full participation by minority individuals, minority organizations, and Historically Black Colleges and Universities in awards for grants and contracts, boards of

organizations receiving assistance under this chapter, peer review panels, and training of professionals in the area of special education is essential to obtain greater success in the education of minority children with disabilities.

**(14)** As the graduation rates for children with disabilities continue to climb, providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities.

**(d) Purposes**

The purposes of this chapter are--

**(1)(A)** to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;

**(B)** to ensure that the rights of children with disabilities and parents of such children are protected; and

**(C)** to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities;

**(2)** to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families;

**(3)** to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting system improvement activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services; and

**(4)** to assess, and ensure the effectiveness of, efforts to educate children with disabilities.

# Effective: October 1, 2016
20 U.S.C.A. § 1401

## § 1401. Definitions
Currentness

Except as otherwise provided, in this chapter:

**(1) Assistive technology device**

**(A) In general**

The term "assistive technology device" means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability.

**(B) Exception**

The term does not include a medical device that is surgically implanted, or the replacement of such device.

**(2) Assistive technology service**

The term "assistive technology service" means any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device. Such term includes--

**(A)** the evaluation of the needs of such child, including a functional evaluation of the child in the child's customary environment;

**(B)** purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices by such child;

**(C)** selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing assistive technology devices;

**(D)** coordinating and using other therapies, interventions, or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs;

**(E)** training or technical assistance for such child, or, where appropriate, the family of such child; and

**(F)** training or technical assistance for professionals (including individuals providing education and rehabilitation services), employers, or other individuals who provide services to, employ, or are otherwise substantially involved in the major life functions of such child.

**(3) Child with a disability**

**(A) In general**

The term "child with a disability" means a child--

**(i)** with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

**(ii)** who, by reason thereof, needs special education and related services.

**(B) Child aged 3 through 9**

The term "child with a disability" for a child aged 3 through 9 (or any subset of that age range, including ages 3 through 5), may, at the discretion of the State and the local educational agency, include a child--

**(i)** experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in 1 or more of the following areas: physical development; cognitive development; communication development; social or emotional development; or adaptive development; and

**(ii)** who, by reason thereof, needs special education and related services.

**(4) Repealed. Pub.L. 114-95, Title IX, § 9215(ss)(1)(A), Dec. 10, 2015, 129 Stat. 2181**

**(5) Educational service agency**

The term "educational service agency"--

**(A)** means a regional public multiservice agency--

**(i)** authorized by State law to develop, manage, and provide services or programs to local educational agencies; and

**(ii)** recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State; and

**(B)** includes any other public institution or agency having administrative control and direction over a public elementary school or secondary school.

**(6) Elementary school**

The term "elementary school" means a nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under State law.

**(7) Equipment**

The term "equipment" includes--

**(A)** machinery, utilities, and built-in equipment, and any necessary enclosures or structures to house such machinery, utilities, or equipment; and

**(B)** all other items necessary for the functioning of a particular facility as a facility for the provision of educational services, including items such as instructional equipment and necessary furniture; printed, published, and audio-visual instructional materials; telecommunications, sensory, and other technological aids and devices; and books, periodicals, documents, and other related materials.

**(8) Excess costs**

The term "excess costs" means those costs that are in excess of the average annual per-student expenditure in a local educational agency during the preceding school year for an elementary school or secondary school student, as may be appropriate, and which shall be computed after deducting--

**(A)** amounts received--

**(i)** under subchapter II;

**(ii)** under part A of title I of the Elementary and Secondary Education Act of 1965; and

**(iii)** under part A of title III of that Act; and

**(B)** any State or local funds expended for programs that would qualify for assistance under any of those parts.

**(9) Free appropriate public education**

The term "free appropriate public education" means special education and related services that--

**(A)** have been provided at public expense, under public supervision and direction, and without charge;

**(B)** meet the standards of the State educational agency;

**(C)** include an appropriate preschool, elementary school, or secondary school education in the State involved; and

**(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

**(10) Repealed. Pub.L. 114-95, Title IX, § 9214(d)(1), Dec. 10, 2015, 129 Stat. 2164**

**(11) Homeless children**

The term "homeless children" has the meaning given the term "homeless children and youths" in section 11434a of Title 42.

**(12) Indian**

The term "Indian" means an individual who is a member of an Indian tribe.

**(13) Indian tribe**

The term "Indian tribe" means any Federal or State Indian tribe, band, rancheria, pueblo, colony, or community, including any Alaska Native village or regional village corporation (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)).

**(14) Individualized education program; IEP**

v

The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title.

**(15) Individualized family service plan**

The term "individualized family service plan" has the meaning given the term in section 1436 of this title.

**(16) Infant or toddler with a disability**

The term "infant or toddler with a disability" has the meaning given the term in section 1432 of this title.

**(17) Institution of higher education**

The term "institution of higher education"--

**(A)** has the meaning given the term in section 1001 of this title; and

**(B)** also includes any college or university receiving funding from the Secretary of the Interior under the Tribally Controlled Colleges and Universities Assistance Act of 1978.

**(18) Limited English proficient**

The term "limited English proficient" has the meaning given the term "English learner" in section 8101 of the Elementary and Secondary Education Act of 1965.

**(19) Local educational agency**

**(A) In general**

The term "local educational agency" means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

**(B) Educational service agencies and other public institutions or agencies**

The term includes--

**(i)** an educational service agency; and

**(ii)** any other public institution or agency having administrative control and direction of a public elementary school or secondary school.

**(C) BIA funded schools**

The term includes an elementary school or secondary school funded by the Bureau of Indian Affairs, but only to the extent that such inclusion makes the school eligible for programs for which specific eligibility is not provided to the school in another provision of law and the school does not have a student population that is smaller than the student population of the local educational agency receiving assistance under this chapter with the smallest student population, except that the school shall not be subject to the jurisdiction of any State educational agency other than the Bureau of Indian Affairs.

**(20) Native language**

The term "native language", when used with respect to an individual who is limited English proficient, means the language normally used by the individual or, in the case of a child, the language normally used by the parents of the child.

**(21) Nonprofit**

The term "nonprofit", as applied to a school, agency, organization, or institution, means a school, agency, organization, or institution owned and operated by 1 or more nonprofit corporations or associations no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual.

**(22) Outlying area**

The term "outlying area" means the United States Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

**(23) Parent**

The term "parent" means--

**(A)** a natural, adoptive, or foster parent of a child (unless a foster parent is prohibited by State law from serving as a parent);

**(B)** a guardian (but not the State if the child is a ward of the State);

**(C)** an individual acting in the place of a natural or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare; or

**(D)** except as used in sections 1415(b)(2) and 1439(a)(5) of this title, an individual assigned under either of those sections to be a surrogate parent.

**(24) Parent organization**

The term "parent organization" has the meaning given the term in section 1471(g) of this title.

**(25) Parent training and information center**

The term "parent training and information center" means a center assisted under section 1471 or 1472 of this title.

**(26) Related services**

**(A) In general**

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

**(B) Exception**

The term does not include a medical device that is surgically implanted, or the replacement of such device.

**(27) Secondary school**

The term "secondary school" means a nonprofit institutional day or residential school, including a public secondary charter school, that provides secondary education, as determined under State law, except that it does not include any education beyond grade 12.

**(28) Secretary**

The term "Secretary" means the Secretary of Education.

**(29) Special education**

The term "special education" means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--

**(A)** instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

**(B)** instruction in physical education.

**(30) Specific learning disability**

**(A) In general**

The term "specific learning disability" means a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations.

**(B) Disorders included**

Such term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

**(C) Disorders not included**

Such term does not include a learning problem that is primarily the result of visual, hearing, or motor disabilities, of intellectual disabilities, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

**(31) State**

The term "State" means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas.

**(32) State educational agency**

The term "State educational agency" means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law.

**(33) Supplementary aids and services**

The term "supplementary aids and services" means aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with section 1412(a)(5) of this title.

**(34) Transition services**

The term "transition services" means a coordinated set of activities for a child with a disability that--

**(A)** is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

**(B)** is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and

**(C)** includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

**(35) Universal design**

The term "universal design" has the meaning given the term in section 3002 of Title 29.

**(36) Ward of the State**

**(A) In general**

The term "ward of the State" means a child who, as determined by the State where the child resides, is a foster child, is a ward of the State, or is in the custody of a public child welfare agency.

**(B) Exception**

The term does not include a foster child who has a foster parent who meets the definition of a parent in paragraph (23).

*** CURRENT THROUGH P.L. 109-481, APPROVED 1/12/2007 ***
*** WITH A GAP OF 109-479 ***

TITLE 20. EDUCATION
CHAPTER 33. EDUCATION OF INDIVIDUALS WITH DISABILITIES
ASSISTANCE FOR EDUCATION OF ALL CHILDREN WITH DISABILITIES


20 USCS § 1414

§ 1414.  Evaluations, eligibility determinations, individualized education programs, and educational placements

(a) Evaluations, parental consent, and reevaluations.
  (1) Initial evaluations.
    (A) In general. A State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation in accordance with this paragraph and subsection (b), before the initial provision of special education and related services to a child with a disability under this part [20 USCS §§ 1411 et seq.].
    (B) Request for initial evaluation. Consistent with subparagraph (D), either a parent of a child, or a State educational agency, other State agency, or local educational agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.
    (C) Procedures.
      (i) In general. Such initial evaluation shall consist of procedures--
        (I) to determine whether a child is a child with a disability (as defined in section 602 [20 USCS § 1401]) within 60 days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe; and
        (II) to determine the educational needs of such child.
      (ii) Exception. The relevant timeframe in clause (i)(I) shall not apply to a local educational agency if--
        (I) a child enrolls in a school served by the local educational agency after the relevant timeframe in clause (i)(I) has begun and prior to a determination by the child's previous local educational agency as to whether the child is a child with a disability (as defined in section 602 [20 USCS § 1401]), but only if the subsequent local educational agency is making sufficient progress to ensure a prompt completion of the evaluation, and the parent and subsequent local educational agency agree to a specific time when the evaluation will be completed; or
        (II) the parent of a child repeatedly fails or refuses to produce the child for the evaluation.
    (D) Parental consent.
      (i) In general.
        (I) Consent for initial evaluation. The agency proposing to conduct an initial evaluation to determine if the child qualifies as a child with a disability as defined in section 602 [20 USCS § 1401] shall obtain informed consent from the parent of such child before conducting the evaluation. Parental consent for evaluation shall not be construed as consent for placement for receipt of special education and related services.
        (II) Consent for services. An agency that is responsible for making a free appropriate public education available to a child with a disability under this part [20 USCS §§ 1411 et seq.] shall seek to obtain informed consent from the parent of such

ix

child before providing special education and related services to the child.

(ii) Absence of consent.

(I) For initial evaluation. If the parent of such child does not provide consent for an initial evaluation under clause (i)(I), or the parent fails to respond to a request to provide the consent, the local educational agency may pursue the initial evaluation of the child by utilizing the procedures described in section 615 [20 USCS § 1415], except to the extent inconsistent with State law relating to such parental consent.

(II) For services. If the parent of such child refuses to consent to services under clause (i)(II), the local educational agency shall not provide special education and related services to the child by utilizing the procedures described in section 615 [20 USCS § 1415].

(III) Effect on agency obligations. If the parent of such child refuses to consent to the receipt of special education and related services, or the parent fails to respond to a request to provide such consent--

(aa) the local educational agency shall not be considered to be in violation of the requirement to make available a free appropriate public education to the child for the failure to provide such child with the special education and related services for which the local educational agency requests such consent; and

(bb) the local educational agency shall not be required to convene an IEP meeting or develop an IEP under this section for the child for the special education and related services for which the local educational agency requests such consent.

(iii) Consent for wards of the State.

(I) In general. If the child is a ward of the State and is not residing with the child's parent, the agency shall make reasonable efforts to obtain the informed consent from the parent (as defined in section 602 [20 USCS § 1401]) of the child for an initial evaluation to determine whether the child is a child with a disability.

(II) Exception. The agency shall not be required to obtain informed consent from the parent of a child for an initial evaluation to determine whether the child is a child with a disability if--

(aa) despite reasonable efforts to do so, the agency cannot discover the whereabouts of the parent of the child;

(bb) the rights of the parents of the child have been terminated in accordance with State law; or

(cc) the rights of the parent to make educational decisions have been subrogated by a judge in accordance with State law and consent for an initial evaluation has been given by an individual appointed by the judge to represent the child.

(E) Rule of construction. The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services.

(2) Reevaluations.

(A) In general. A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c)--

(i) if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(ii) if the child's parents or teacher requests a reevaluation.

(B) Limitation. A reevaluation conducted under subparagraph (A) shall occur--

(i) not more frequently than once a year, unless the parent and the local educational agency agree otherwise; and

(ii) at least once every 3 years, unless the parent and the local educational

x

agency agree that a reevaluation is unnecessary.

(b) Evaluation procedures.

(1) Notice. The local educational agency shall provide notice to the parents of a child with a disability, in accordance with subsections (b)(3), (b)(4), and (c) of section 615 [20 USCS § 1415], that describes any evaluation procedures such agency proposes to conduct.

(2) Conduct of evaluation. In conducting the evaluation, the local educational agency shall--

(A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining--

(i) whether the child is a child with a disability; and

(ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum, or, for preschool children, to participate in appropriate activities;

(B) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child; and

(C) use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(3) Additional requirements. Each local educational agency shall ensure that--

(A) assessments and other evaluation materials used to assess a child under this section--

(i) are selected and administered so as not to be discriminatory on a racial or cultural basis;

(ii) are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer;

(iii) are used for purposes for which the assessments or measures are valid and reliable;

(iv) are administered by trained and knowledgeable personnel; and

(v) are administered in accordance with any instructions provided by the producer of such assessments;

(B) the child is assessed in all areas of suspected disability;

(C) assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided; and

(D) assessments of children with disabilities who transfer from 1 school district to another school district in the same academic year are coordinated with such children's prior and subsequent schools, as necessary and as expeditiously as possible, to ensure prompt completion of full evaluations.

(4) Determination of eligibility and educational need. Upon completion of the administration of assessments and other evaluation measures--

(A) the determination of whether the child is a child with a disability as defined in section 602(3) [20 USCS § 1401(3)] and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child in accordance with paragraph (5); and

(B) a copy of the evaluation report and the documentation of determination of eligibility shall be given to the parent.

(5) Special rule for eligibility determination. In making a determination of eligibility

under paragraph (4)(A), a child shall not be determined to be a child with a disability if the determinant factor for such determination is--

(A) lack of appropriate instruction in reading, including in the essential components of reading instruction (as defined in section 1208(3) of the Elementary and Secondary Education Act of 1965 [20 USCS § 6368(3)]);

(B) lack of instruction in math; or

(C) limited English proficiency.

(6) Specific learning disabilities.

(A) In general. Notwithstanding section 607(b) [20 USCS § 1406(b)], when determining whether a child has a specific learning disability as defined in section 602 [20 USCS § 1401], a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability in oral expression, listening comprehension, written expression, basic reading skill, reading comprehension, mathematical calculation, or mathematical reasoning.

(B) Additional authority. In determining whether a child has a specific learning disability, a local educational agency may use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures described in paragraphs (2) and (3).

(c) Additional requirements for evaluation and reevaluations.

(1) Review of existing evaluation data. As part of an initial evaluation (if appropriate) and as part of any reevaluation under this section, the IEP Team and other qualified professionals, as appropriate, shall--

(A) review existing evaluation data on the child, including--

(i) evaluations and information provided by the parents of the child;

(ii) current classroom-based, local, or State assessments, and classroom-based observations; and

(iii) observations by teachers and related services providers; and

(B) on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine--

(i) whether the child is a child with a disability as defined in section 602(3) [20 USCS § 1401(3)], and the educational needs of the child, or, in case of a reevaluation of a child, whether the child continues to have such a disability and such educational needs;

(ii) the present levels of academic achievement and related developmental needs of the child;

(iii) whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the individualized education program of the child and to participate, as appropriate, in the general education curriculum.

(2) Source of data. The local educational agency shall administer such assessments and other evaluation measures as may be needed to produce the data identified by the IEP Team under paragraph (1)(B).

(3) Parental consent. Each local educational agency shall obtain informed parental consent, in accordance with subsection (a)(1)(D), prior to conducting any reevaluation of a child with a disability, except that such informed parental consent need not be obtained if the local educational agency can demonstrate that it had taken reasonable measures to obtain such consent and the child's parent has failed to respond.

(4) Requirements if additional data are not needed. If the IEP Team and other qualified professionals, as appropriate, determine that no additional data are needed to determine whether the child continues to be a child with a disability and to determine the child's educational needs, the local educational agency--

(A) shall notify the child's parents of--

(i) that determination and the reasons for the determination; and

(ii) the right of such parents to request an assessment to determine whether the child continues to be a child with a disability and to determine the child's educational needs; and

(B) shall not be required to conduct such an assessment unless requested to by the child's parents.

(5) Evaluations before change in eligibility.

(A) In general. Except as provided in subparagraph (B), a local educational agency shall evaluate a child with a disability in accordance with this section before determining that the child is no longer a child with a disability.

(B) Exception.

(i) In general. The evaluation described in subparagraph (A) shall not be required before the termination of a child's eligibility under this part [20 USCS §§ 1411 et seq.] due to graduation from secondary school with a regular diploma, or due to exceeding the age eligibility for a free appropriate public education under State law.

(ii) Summary of performance. For a child whose eligibility under this part [20 USCS §§ 1411 et seq.] terminates under circumstances described in clause (i), a local educational agency shall provide the child with a summary of the child's academic achievement and functional performance, which shall include recommendations on how to assist the child in meeting the child's postsecondary goals.

(d) Individualized education programs.

(1) Definitions. In this title [20 USCS §§ 1400 et seq.]:

(A) Individualized education program.

(i) In general. The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes--

(I) a statement of the child's present levels of academic achievement and functional performance, including--

(aa) how the child's disability affects the child's involvement and progress in the general education curriculum;

(bb) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; and

(cc) for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

(II) a statement of measurable annual goals, including academic and functional goals, designed to--

(aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(bb) meet each of the child's other educational needs that result from the child's disability;

(III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the

use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

      (IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child--

         (aa) to advance appropriately toward attaining the annual goals;

         (bb) to be involved in and make progress in the general education curriculum in accordance with subclause (I) and to participate in extracurricular and other nonacademic activities; and

         (cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph;

      (V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc);

      (VI) (aa) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 612(a)(16)(A) [20 USCS § 1412(a)(16)(A)]; and

      (bb) if the IEP Team determines that the child shall take an alternate assessment on a particular State or districtwide assessment of student achievement, a statement of why--

         (AA) the child cannot participate in the regular assessment; and

         (BB) the particular alternate assessment selected is appropriate for the child;

      (VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications; and

      (VIII) beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter--

         (aa) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills;

         (bb) the transition services (including courses of study) needed to assist the child in reaching those goals; and

         (cc) beginning not later than 1 year before the child reaches the age of majority under State law, a statement that the child has been informed of the child's rights under this title [20 USCS §§ 1400 et seq.], if any, that will transfer to the child on reaching the age of majority under section 615(m) [20 USCS § 1415(m)].

    (ii) Rule of construction. Nothing in this section shall be construed to require--

      (I) that additional information be included in a child's IEP beyond what is explicitly required in this section; and

      (II) the IEP Team to include information under 1 component of a child's IEP that is already contained under another component of such IEP.

   (B) Individualized education program team. The term "individualized education program team" or "IEP Team" means a group of individuals composed of--

    (i) the parents of a child with a disability;

    (ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

    (iii) not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child;

    (iv) a representative of the local educational agency who--

(I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(II) is knowledgeable about the general education curriculum; and

(III) is knowledgeable about the availability of resources of the local educational agency;

(v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);

(vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(vii) whenever appropriate, the child with a disability.

(C) IEP team attendance.

(i) Attendance not necessary. A member of the IEP Team shall not be required to attend an IEP meeting, in whole or in part, if the parent of a child with a disability and the local educational agency agree that the attendance of such member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting.

(ii) Excusal. A member of the IEP Team may be excused from attending an IEP meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if--

(I) the parent and the local educational agency consent to the excusal; and

(II) the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting.

(iii) Written agreement and consent required. A parent's agreement under clause (i) and consent under clause (ii) shall be in writing.

(D) IEP team transition. In the case of a child who was previously served under part C [20 USCS §§ 1431 et seq.], an invitation to the initial IEP meeting shall, at the request of the parent, be sent to the part C service coordinator or other representatives of the part C system to assist with the smooth transition of services.

(2) Requirement that program be in effect.

(A) In general. At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program, as defined in paragraph (1)(A).

(B) Program for child aged 3 through 5. In the case of a child with a disability aged 3 through 5 (or, at the discretion of the State educational agency, a 2-year-old child with a disability who will turn age 3 during the school year), the IEP Team shall consider the individualized family service plan that contains the material described in section 636 [20 USCS § 1436], and that is developed in accordance with this section, and the individualized family service plan may serve as the IEP of the child if using that plan as the IEP is--

(i) consistent with State policy; and

(ii) agreed to by the agency and the child's parents.

(C) Program for children who transfer school districts.

(i) In general.

(I) Transfer within the same State. In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.

(II) Transfer outside State. In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in another State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency conducts an evaluation pursuant to subsection (a)(1), if determined to be necessary by such agency, and develops a new IEP, if appropriate, that is consistent with Federal and State law.

(ii) Transmittal of records. To facilitate the transition for a child described in clause (i)--

(I) the new school in which the child enrolls shall take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous school in which the child was enrolled, pursuant to section 99.31(a)(2) of title 34, Code of Federal Regulations; and

(II) the previous school in which the child was enrolled shall take reasonable steps to promptly respond to such request from the new school.

(3) Development of IEP.

(A) In general. In developing each child's IEP, the IEP Team, subject to subparagraph (C), shall consider--

(i) the strengths of the child;

(ii) the concerns of the parents for enhancing the education of their child;

(iii) the results of the initial evaluation or most recent evaluation of the child; and

(iv) the academic, developmental, and functional needs of the child.

(B) Consideration of special factors. The IEP Team shall--

(i) in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior;

(ii) in the case of a child with limited English proficiency, consider the language needs of the child as such needs relate to the child's IEP;

(iii) in the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP Team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the child's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the child;

(iv) consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and

(v) consider whether the child needs assistive technology devices and services.

(C) Requirement with respect to regular education teacher. A regular education teacher of the child, as a member of the IEP Team, shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate positive behavioral interventions and supports, and other strategies, and the determination of supplementary aids and services, program modifications, and support for school personnel consistent with paragraph (1)(A)(i)(IV).

(D) Agreement. In making changes to a child's IEP after the annual IEP meeting for a school year, the parent of a child with a disability and the local educational

agency may agree not to convene an IEP meeting for the purposes of making such changes, and instead may develop a written document to amend or modify the child's current IEP.

(E) Consolidation of IEP team meetings. To the extent possible, the local educational agency shall encourage the consolidation of reevaluation meetings for the child and other IEP Team meetings for the child.

(F) Amendments. Changes to the IEP may be made either by the entire IEP Team or, as provided in subparagraph (D), by amending the IEP rather than by redrafting the entire IEP. Upon request, a parent shall be provided with a revised copy of the IEP with the amendments incorporated.

(4) Review and revision of IEP.

(A) In general. The local educational agency shall ensure that, subject to subparagraph (B), the IEP Team--

(i) reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved; and

(ii) revises the IEP as appropriate to address--

(I) any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate;

(II) the results of any reevaluation conducted under this section;

(III) information about the child provided to, or by, the parents, as described in subsection (c)(1)(B);

(IV) the child's anticipated needs; or

(V) other matters.

(B) Requirement with respect to regular education teacher. A regular education teacher of the child, as a member of the IEP Team, shall, consistent with paragraph (1)(C), participate in the review and revision of the IEP of the child.

(5) Multi-year IEP demonstration.

(A) Pilot program.

(i) Purpose. The purpose of this paragraph is to provide an opportunity for States to allow parents and local educational agencies the opportunity for long-term planning by offering the option of developing a comprehensive multi-year IEP, not to exceed 3 years, that is designed to coincide with the natural transition points for the child.

(ii) Authorization. In order to carry out the purpose of this paragraph, the Secretary is authorized to approve not more than 15 proposals from States to carry out the activity described in clause (i).

(iii) Proposal.

(I) In general. A State desiring to participate in the program under this paragraph shall submit a proposal to the Secretary at such time and in such manner as the Secretary may reasonably require.

(II) Content. The proposal shall include--

(aa) assurances that the development of a multi-year IEP under this paragraph is optional for parents;

(bb) assurances that the parent is required to provide informed consent before a comprehensive multi-year IEP is developed;

(cc) a list of required elements for each multi-year IEP, including--

(AA) measurable goals pursuant to paragraph (1)(A)(i)(II), coinciding with natural transition points for the child, that will enable the child to be involved in and make progress in the general education curriculum and that will meet the child's other needs that result from the child's disability; and

(BB) measurable annual goals for determining progress toward meeting the goals described in subitem (AA); and

(dd) a description of the process for the review and revision of each multi-

xvii

year IEP, including--

    (AA) a review by the IEP Team of the child's multi-year IEP at each of the child's natural transition points;

    (BB) in years other than a child's natural transition points, an annual review of the child's IEP to determine the child's current levels of progress and whether the annual goals for the child are being achieved, and a requirement to amend the IEP, as appropriate, to enable the child to continue to meet the measurable goals set out in the IEP;

    (CC) if the IEP Team determines on the basis of a review that the child is not making sufficient progress toward the goals described in the multi-year IEP, a requirement that the local educational agency shall ensure that the IEP Team carries out a more thorough review of the IEP in accordance with paragraph (4) within 30 calendar days; and

    (DD) at the request of the parent, a requirement that the IEP Team shall conduct a review of the child's multi-year IEP rather than or subsequent to an annual review.

    (B) Report. Beginning 2 years after the date of enactment of the Individuals with Disabilities Education Improvement Act of 2004 [enacted Dec. 3, 2004], the Secretary shall submit an annual report to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate regarding the effectiveness of the program under this paragraph and any specific recommendations for broader implementation of such program, including--

    (i) reducing--

    (I) the paperwork burden on teachers, principals, administrators, and related service providers; and

    (II) noninstructional time spent by teachers in complying with this part [20 USCS §§ 1411 et seq.];

    (ii) enhancing longer-term educational planning;

    (iii) improving positive outcomes for children with disabilities;

    (iv) promoting collaboration between IEP Team members; and

    (v) ensuring satisfaction of family members.

    (C) Definition. In this paragraph, the term "natural transition points" means those periods that are close in time to the transition of a child with a disability from preschool to elementary grades, from elementary grades to middle or junior high school grades, from middle or junior high school grades to secondary school grades, and from secondary school grades to post-secondary activities, but in no case a period longer than 3 years.

  (6) Failure to meet transition objectives. If a participating agency, other than the local educational agency, fails to provide the transition services described in the IEP in accordance with paragraph (1)(A)(i)(VIII), the local educational agency shall reconvene the IEP Team to identify alternative strategies to meet the transition objectives for the child set out in the IEP.

  (7) Children with disabilities in adult prisons.

    (A) In general. The following requirements shall not apply to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons:

    (i) The requirements contained in section 612(a)(16) [20 USCS § 1412(a)(16)] and paragraph (1)(A)(i)(VI) (relating to participation of children with disabilities in general assessments).

    (ii) The requirements of items (aa) and (bb) of paragraph (1)(A)(i)(VIII) (relating to transition planning and transition services), do not apply with respect to such children whose eligibility under this part [20 USCS §§ 1411 et seq.] will end,

because of such children's age, before such children will be released from prison.

   (B) Additional requirement. If a child with a disability is convicted as an adult under State law and incarcerated in an adult prison, the child's IEP Team may modify the child's IEP or placement notwithstanding the requirements of sections 612(a)(5)(A) [20 USCS § 1412(a)(5)(A)] and paragraph (1)(A) if the State has demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated.

(e) Educational placements. Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.

(f) Alternative means of meeting participation. When conducting IEP team meetings and placement meetings pursuant to this section, section 615(e) [20 USCS § 1415(e)], and section 615(f)(1)(B) [20 USCS § 1415(f)(1)(B)], and carrying out administrative matters under section 615 [20 USCS § 1415] (such as scheduling, exchange of witness lists, and status conferences), the parent of a child with a disability and a local educational agency may agree to use alternative means of

*** CURRENT THROUGH P.L. 109-481, APPROVED 1/12/2007 ***
*** WITH A GAP OF 109-479 ***

TITLE 20. EDUCATION
CHAPTER 33. EDUCATION OF INDIVIDUALS WITH DISABILITIES
ASSISTANCE FOR EDUCATION OF ALL CHILDREN WITH DISABILITIES


20 USCS § 1415

§ 1415.  Procedural safeguards

(a) Establishment of procedures. Any State educational agency, State agency, or local educational agency that receives assistance under this part [20 USCS §§ 1411 et seq.] shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

(b) Types of procedures. The procedures required by this section shall include the following:
   (1) An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.
   (2) (A) Procedures to protect the rights of the child whenever the parents of the child are not known, the agency cannot, after reasonable efforts, locate the parents, or the child is a ward of the State, including the assignment of an individual to act as a surrogate for the parents, which surrogate shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child. In the case of--
      (i) a child who is a ward of the State, such surrogate may alternatively be appointed by the judge overseeing the child's care provided that the surrogate meets the requirements of this paragraph; and
      (ii) an unaccompanied homeless youth as defined in section 725(6) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(6)), the local educational agency shall appoint a surrogate in accordance with this paragraph.
      (B) The State shall make reasonable efforts to ensure the assignment of a surrogate not more than 30 days after there is a determination by the agency that the child needs a surrogate.
   (3) Written prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency--
      (A) proposes to initiate or change; or
      (B) refuses to initiate or change,
   the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.
   (4) Procedures designed to ensure that the notice required by paragraph (3) is in the native language of the parents, unless it clearly is not feasible to do so.
   (5) An opportunity for mediation, in accordance with subsection (e).
   (6) An opportunity for any party to present a complaint--
      (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public

education to such child; and

(B) which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this part [20 USCS §§ 1411 et seq.], in such time as the State law allows, except that the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph.

(7) (A) Procedures that require either party, or the attorney representing a party, to provide due process complaint notice in accordance with subsection (c)(2) (which shall remain confidential)--

(i) to the other party, in the complaint filed under paragraph (6), and forward a copy of such notice to the State educational agency; and

(ii) that shall include--

(I) the name of the child, the address of the residence of the child (or available contact information in the case of a homeless child), and the name of the school the child is attending;

(II) in the case of a homeless child or youth (within the meaning of section 725(2) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(2)), available contact information for the child and the name of the school the child is attending;

(III) a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem; and

(IV) a proposed resolution of the problem to the extent known and available to the party at the time.

(B) A requirement that a party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of subparagraph (A)(ii).

(8) Procedures that require the State educational agency to develop a model form to assist parents in filing a complaint and due process complaint notice in accordance with paragraphs (6) and (7), respectively.

(c) Notification requirements.

(1) Content of prior written notice. The notice required by subsection (b)(3) shall include--

(A) a description of the action proposed or refused by the agency;

(B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

(C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part [20 USCS §§ 1411 et seq.] and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(D) sources for parents to contact to obtain assistance in understanding the provisions of this part [20 USCS §§ 1411 et seq.];

(E) a description of other options considered by the IEP Team and the reason why those options were rejected; and

(F) a description of the factors that are relevant to the agency's proposal or refusal.

(2) Due process complaint notice.

(A) Complaint. The due process complaint notice required under subsection (b)(7)(A) shall be deemed to be sufficient unless the party receiving the notice notifies the hearing officer and the other party in writing that the receiving party

believes the notice has not met the requirements of subsection (b)(7)(A).

(B) Response to complaint.

(i) Local educational agency response.

(I) In general. If the local educational agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include--

(aa) an explanation of why the agency proposed or refused to take the action raised in the complaint;

(bb) a description of other options that the IEP Team considered and the reasons why those options were rejected;

(cc) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and

(dd) a description of the factors that are relevant to the agency's proposal or refusal.

(II) Sufficiency. A response filed by a local educational agency pursuant to subclause (I) shall not be construed to preclude such local educational agency from asserting that the parent's due process complaint notice was insufficient where appropriate.

(ii) Other party response. Except as provided in clause (i), the non-complaining party shall, within 10 days of receiving the complaint, send to the complaint a response that specifically addresses the issues raised in the complaint.

(C) Timing. The party providing a hearing officer notification under subparagraph (A) shall provide the notification within 15 days of receiving the complaint.

(D) Determination. Within 5 days of receipt of the notification provided under subparagraph (C), the hearing officer shall make a determination on the face of the notice of whether the notification meets the requirements of subsection (b)(7)(A), and shall immediately notify the parties in writing of such determination.

(E) Amended complaint notice.

(i) In general. A party may amend its due process complaint notice only if--

(I) the other party consents in writing to such amendment and is given the opportunity to resolve the complaint through a meeting held pursuant to subsection (f)(1)(B); or

(II) the hearing officer grants permission, except that the hearing officer may only grant such permission at any time not later than 5 days before a due process hearing occurs.

(ii) Applicable timeline. The applicable timeline for a due process hearing under this part [20 USCS §§ 1411 et seq.] shall recommence at the time the party files an amended notice, including the timeline under subsection (f)(1)(B).

(d) Procedural safeguards notice.

(1) In general.

(A) Copy to parents. A copy of the procedural safeguards available to the parents of a child with a disability shall be given to the parents only 1 time a year, except that a copy also shall be given to the parents--

(i) upon initial referral or parental request for evaluation;

(ii) upon the first occurrence of the filing of a complaint under subsection (b)(6); and

(iii) upon request by a parent.

(B) Internet website. A local educational agency may place a current copy of the procedural safeguards notice on its Internet website if such website exists.

(2) Contents. The procedural safeguards notice shall include a full explanation of the procedural safeguards, written in the native language of the parents (unless it

clearly is not feasible to do so) and written in an easily understandable manner, available under this section and under regulations promulgated by the Secretary relating to--

(A) independent educational evaluation;

(B) prior written notice;

(C) parental consent;

(D) access to educational records;

(E) the opportunity to present and resolve complaints, including--

(i) the time period in which to make a complaint;

(ii) the opportunity for the agency to resolve the complaint; and

(iii) the availability of mediation;

(F) the child's placement during pendency of due process proceedings;

(G) procedures for students who are subject to placement in an interim alternative educational setting;

(H) requirements for unilateral placement by parents of children in private schools at public expense;

(I) due process hearings, including requirements for disclosure of evaluation results and recommendations;

(J) State-level appeals (if applicable in that State);

(K) civil actions, including the time period in which to file such actions; and

(L) attorneys' fees.

(e) Mediation.

(1) In general. Any State educational agency or local educational agency that receives assistance under this part [20 USCS §§ 1411 et seq.] shall ensure that procedures are established and implemented to allow parties to disputes involving any matter, including matters arising prior to the filing of a complaint pursuant to subsection (b)(6), to resolve such disputes through a mediation process.

(2) Requirements. Such procedures shall meet the following requirements:

(A) The procedures shall ensure that the mediation process--

(i) is voluntary on the part of the parties;

(ii) is not used to deny or delay a parent's right to a due process hearing under subsection (f), or to deny any other rights afforded under this part [20 USCS §§ 1411 et seq.]; and

(iii) is conducted by a qualified and impartial mediator who is trained in effective mediation techniques.

(B) Opportunity to meet with a disinterested party. A local educational agency or a State agency may establish procedures to offer to parents and schools that choose not to use the mediation process, an opportunity to meet, at a time and location convenient to the parents, with a disinterested party who is under contract with--

(i) a parent training and information center or community parent resource center in the State established under section 671 or 672 [20 USCS § 1471 or 1472]; or

(ii) an appropriate alternative dispute resolution entity,

to encourage the use, and explain the benefits, of the mediation process to the parents.

(C) List of qualified mediators. The State shall maintain a list of individuals who are qualified mediators and knowledgeable in laws and regulations relating to the provision of special education and related services.

(D) Costs. The State shall bear the cost of the mediation process, including the costs of meetings described in subparagraph (B).

(E) Scheduling and location. Each session in the mediation process shall be scheduled in a timely manner and shall be held in a location that is convenient to the

parties to the dispute.

(F) Written agreement. In the case that a resolution is reached to resolve the complaint through the mediation process, the parties shall execute a legally binding agreement that sets forth such resolution and that--

(i) states that all discussions that occurred during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding;

(ii) is signed by both the parent and a representative of the agency who has the authority to bind such agency; and

(iii) is enforceable in any State court of competent jurisdiction or in a district court of the United States.

(G) Mediation discussions. Discussions that occur during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding.

(f) Impartial due process hearing.

(1) In general.

(A) Hearing. Whenever a complaint has been received under subsection (b)(6) or (k), the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

(B) Resolution session.

(i) Preliminary meeting. Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint--

(I) within 15 days of receiving notice of the parents' complaint;

(II) which shall include a representative of the agency who has decisionmaking authority on behalf of such agency;

(III) which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney; and

(IV) where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint,

unless the parents and the local educational agency agree in writing to waive such meeting, or agree to use the mediation process described in subsection (e).

(ii) Hearing. If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this part [20 USCS §§ 1411 et seq.] shall commence.

(iii) Written settlement agreement. In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is--

(I) signed by both the parent and a representative of the agency who has the authority to bind such agency; and

(II) enforceable in any State court of competent jurisdiction or in a district court of the United States.

(iv) Review period. If the parties execute an agreement pursuant to clause (iii), a party may void such agreement within 3 business days of the agreement's execution.

(2) Disclosure of evaluations and recommendations.

(A) In general. Not less than 5 business days prior to a hearing conducted

xxiv

pursuant to paragraph (1), each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing.

(B) Failure to disclose. A hearing officer may bar any party that fails to comply with subparagraph (A) from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

(3) Limitations on hearing.

(A) Person conducting hearing. A hearing officer conducting a hearing pursuant to paragraph (1)(A) shall, at a minimum--

(i) not be--

(I) an employee of the State educational agency or the local educational agency involved in the education or care of the child; or

(II) a person having a personal or professional interest that conflicts with the person's objectivity in the hearing;

(ii) possess knowledge of, and the ability to understand, the provisions of this title [20 USCS §§ 1400 et seq.], Federal and State regulations pertaining to this title [20 USCS §§ 1400 et seq.], and legal interpretations of this title [20 USCS §§ 1400 et seq.] by Federal and State courts;

(iii) possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and

(iv) possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice.

(B) Subject matter of hearing. The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise.

(C) Timeline for requesting hearing. A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this part [20 USCS §§ 1411 et seq.], in such time as the State law allows.

(D) Exceptions to the timeline. The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to--

(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

(ii) the local educational agency's withholding of information from the parent that was required under this part [20 USCS §§ 1411 et seq.] to be provided to the parent.

(E) Decision of hearing officer.

(i) In general. Subject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education.

(ii) Procedural issues. In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--

(I) impeded the child's right to a free appropriate public education;

(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(III) caused a deprivation of educational benefits.

(iii) Rule of construction. Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section.

(F) Rule of construction. Nothing in this paragraph shall be construed to affect the right of a parent to file a complaint with the State educational agency.

(g) Appeal.
  (1) In general. If the hearing required by subsection (f) is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency.
  (2) Impartial review and independent decision. The State educational agency shall conduct an impartial review of the findings and decision appealed under paragraph (1). The officer conducting such review shall make an independent decision upon completion of such review.

(h) Safeguards. Any party to a hearing conducted pursuant to subsection (f) or (k), or an appeal conducted pursuant to subsection (g), shall be accorded--
  (1) the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;
  (2) the right to present evidence and confront, cross-examine, and compel the attendance of witnesses;
  (3) the right to a written, or, at the option of the parents, electronic verbatim record of such hearing; and
  (4) the right to written, or, at the option of the parents, electronic findings of fact and decisions, which findings and decisions--
    (A) shall be made available to the public consistent with the requirements of section 617(b) [20 USCS § 1417(b)] (relating to the confidentiality of data, information, and records); and
    (B) shall be transmitted to the advisory panel established pursuant to section 612(a)(21) [20 USCS § 1412(a)(21)].

(i) Administrative procedures.
  (1) In general.
    (A) Decision made in hearing. A decision made in a hearing conducted pursuant to subsection (f) or (k) shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (g) and paragraph (2).
    (B) Decision made at appeal. A decision made under subsection (g) shall be final, except that any party may bring an action under paragraph (2).
  (2) Right to bring civil action.
    (A) In general. Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.
    (B) Limitation. The party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this part [20 USCS §§ 1411 et seq.], in such time as the State law allows.
    (C) Additional requirements. In any action brought under this paragraph, the court--
      (i) shall receive the records of the administrative proceedings;
      (ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

(3) Jurisdiction of district courts; attorneys' fees.

(A) In general. The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy.

(B) Award of attorneys' fees.

(i) In general. In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs--

(I) to a prevailing party who is the parent of a child with a disability;

(II) to a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

(III) to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

(ii) Rule of construction. Nothing in this subparagraph shall be construed to affect section 327 of the District of Columbia Appropriations Act, 2005.

(C) Determination of amount of attorneys' fees. Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection.

(D) Prohibition of attorneys' fees and related costs for certain services.

(i) In general. Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if--

(I) the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;

(II) the offer is not accepted within 10 days; and

(III) the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

(ii) IEP team meetings. Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened as a result of an administrative proceeding or judicial action, or, at the discretion of the State, for a mediation described in subsection (e).

(iii) Opportunity to resolve complaints. A meeting conducted pursuant to subsection (f)(1)(B)(i) shall not be considered--

(I) a meeting convened as a result of an administrative hearing or judicial action; or

(II) an administrative hearing or judicial action for purposes of this paragraph.

(E) Exception to prohibition on attorneys' fees and related costs. Notwithstanding subparagraph (D), an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer.

(F) Reduction in amount of attorneys' fees. Except as provided in subparagraph (G), whenever the court finds that--

(i) the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;

xxvii

(ii) the amount of the attorneys' fees otherwise authorized to be awarded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience;

(iii) the time spent and legal services furnished were excessive considering the nature of the action or proceeding; or

(iv) the attorney representing the parent did not provide to the local educational agency the appropriate information in the notice of the complaint described in subsection (b)(7)(A),

the court shall reduce, accordingly, the amount of the attorneys' fees awarded under this section.

(G) Exception to reduction in amount of attorneys' fees. The provisions of subparagraph (F) shall not apply in any action or proceeding if the court finds that the State or local educational agency unreasonably protracted the final resolution of the action or proceeding or there was a violation of this section.

(j) Maintenance of current educational placement. Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

(k) Placement in alternative educational setting.

(1) Authority of school personnel.

(A) Case-by-case determination. School personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct.

(B) Authority. School personnel under this subsection may remove a child with a disability who violates a code of student conduct from their current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 school days (to the extent such alternatives are applied to children without disabilities).

(C) Additional authority. If school personnel seek to order a change in placement that would exceed 10 school days and the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability pursuant to subparagraph (E), the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except as provided in section 612(a)(1) [20 USCS § 1412(a)(1)] although it may be provided in an interim alternative educational setting.

(D) Services. A child with a disability who is removed from the child's current placement under subparagraph (G) (irrespective of whether the behavior is determined to be a manifestation of the child's disability) or subparagraph (C) shall--

(i) continue to receive educational services, as provided in section 612(a)(1) [20 USCS § 1412(a)(1)], so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and

(ii) receive, as appropriate, a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur.

(E) Manifestation determination.

(i) In general. Except as provided in subparagraph (B), within 10 school days

of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine--

    (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

    (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

    (ii) Manifestation. If the local educational agency, the parent, and relevant members of the IEP Team determine that either subclause (I) or (II) of clause (i) is applicable for the child, the conduct shall be determined to be a manifestation of the child's disability.

  (F) Determination that behavior was a manifestation. If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team shall--

    (i) conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child, provided that the local educational agency had not conducted such assessment prior to such determination before the behavior that resulted in a change in placement described in subparagraph (C) or (G);

    (ii) in the situation where a behavioral intervention plan has been developed, review the behavioral intervention plan if the child already has such a behavioral intervention plan, and modify it, as necessary, to address the behavior; and

    (iii) except as provided in subparagraph (G), return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan.

  (G) Special circumstances. School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, in cases where a child--

    (i) carries or possesses a weapon to or at school, on school premises, or to or at a school function under the jurisdiction of a State or local educational agency;

    (ii) knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency; or

    (iii) has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency.

  (H) Notification. Not later than the date on which the decision to take disciplinary action is made, the local educational agency shall notify the parents of that decision, and of all procedural safeguards accorded under this section.

  (2) Determination of setting. The interim alternative educational setting in subparagraphs (C) and (G) of paragraph (1) shall be determined by the IEP Team.

  (3) Appeal.

  (A) In general. The parent of a child with a disability who disagrees with any decision regarding placement, or the manifestation determination under this subsection, or a local educational agency that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others, may request a hearing.

  (B) Authority of hearing officer.

    (i) In general. A hearing officer shall hear, and make a determination

regarding, an appeal requested under subparagraph (A).

(ii) Change of placement order. In making the determination under clause (i), the hearing officer may order a change in placement of a child with a disability. In such situations, the hearing officer may--

(I) return a child with a disability to the placement from which the child was removed; or

(II) order a change in placement of a child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or to others.

(4) Placement during appeals. When an appeal under paragraph (3) has been requested by either the parent or the local educational agency--

(A) the child shall remain in the interim alternative educational setting pending the decision of the hearing officer or until the expiration of the time period provided for in paragraph (1)(C), whichever occurs first, unless the parent and the State or local educational agency agree otherwise; and

(B) the State or local educational agency shall arrange for an expedited hearing, which shall occur within 20 school days of the date the hearing is requested and shall result in a determination within 10 school days after the hearing.

(5) Protections for children not yet eligible for special education and related services.

(A) In general. A child who has not been determined to be eligible for special education and related services under this part [20 USCS §§ 1411 et seq.] and who has engaged in behavior that violates a code of student conduct, may assert any of the protections provided for in this part [20 USCS §§ 1411 et seq.] if the local educational agency had knowledge (as determined in accordance with this paragraph) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.

(B) Basis of knowledge. A local educational agency shall be deemed to have knowledge that a child is a child with a disability if, before the behavior that precipitated the disciplinary action occurred--

(i) the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;

(ii) the parent of the child has requested an evaluation of the child pursuant to section 614(a)(1)(B) [20 USCS § 1414(a)(1)(B)]; or

(iii) the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency.

(C) Exception. A local educational agency shall not be deemed to have knowledge that the child is a child with a disability if the parent of the child has not allowed an evaluation of the child pursuant to section 614 [20 USCS § 1414] or has refused services under this part [20 USCS §§ 1411 et seq.] or the child has been evaluated and it was determined that the child was not a child with a disability under this part [20 USCS §§ 1411 et seq.].

(D) Conditions that apply if no basis of knowledge.

(i) In general. If a local educational agency does not have knowledge that a child is a child with a disability (in accordance with subparagraph (B) or (C)) prior to taking disciplinary measures against the child, the child may be subjected to disciplinary measures applied to children without disabilities who engaged in comparable behaviors consistent with clause (ii).

(ii) Limitations. If a request is made for an evaluation of a child during the

xxx

time period in which the child is subjected to disciplinary measures under this subsection, the evaluation shall be conducted in an expedited manner. If the child is determined to be a child with a disability, taking into consideration information from the evaluation conducted by the agency and information provided by the parents, the agency shall provide special education and related services in accordance with this part [20 USCS §§ 1411 et seq.], except that, pending the results of the evaluation, the child shall remain in the educational placement determined by school authorities.

   (6) Referral to and action by law enforcement and judicial authorities.
      (A) Rule of construction. Nothing in this part [20 USCS §§ 1411 et seq.] shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.
      (B) Transmittal of records. An agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime.

   (7) Definitions. In this subsection:
      (A) Controlled substance. The term "controlled substance" means a drug or other substance identified under schedule I, II, III, IV, or V in section 202(c) of the Controlled Substances Act (21 U.S.C. 812(c)).
      (B) Illegal drug. The term "illegal drug" means a controlled substance but does not include a controlled substance that is legally possessed or used under the supervision of a licensed health-care professional or that is legally possessed or used under any other authority under that Act or under any other provision of Federal law.
      (C) Weapon. The term "weapon" has the meaning given the term "dangerous weapon" under section 930(g)(2) of title 18, United States Code.
      (D) Serious bodily injury. The term "serious bodily injury" has the meaning given the term "serious bodily injury" under paragraph (3) of subsection (h) of section 1365 of title 18, United States Code.

(l) Rule of construction. Nothing in this title [20 USCS §§ 1400 et seq.] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973 [29 USCS §§ 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this part [20 USCS §§ 1411 et seq.], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part [20 USCS §§ 1411 et seq.].

(m) Transfer of parental rights at age of majority.
   (1) In general. A State that receives amounts from a grant under this part [20 USCS §§ 1411 et seq.] may provide that, when a child with a disability reaches the age of majority under State law (except for a child with a disability who has been determined to be incompetent under State law)--
      (A) the agency shall provide any notice required by this section to both the individual and the parents;
      (B) all other rights accorded to parents under this part [20 USCS §§ 1411 et seq.] transfer to the child;
      (C) the agency shall notify the individual and the parents of the transfer of rights; and

(D) all rights accorded to parents under this part [20 USCS §§ 1411 et seq.] transfer to children who are incarcerated in an adult or juvenile Federal, State, or local correctional institution.

(2) Special rule. If, under State law, a child with a disability who has reached the age of majority under State law, who has not been determined to be incompetent, but who is determined not to have the ability to provide informed consent with respect to the educational program of the child, the State shall establish procedures for appointing the parent of the child, or if the parent is not available, another appropriate individual, to represent the educational interests of the child throughout the period of eligibility of the child under this part [20 USCS §§ 1411 et seq.].

(n) Electronic mail. A parent of a child with a disability may elect to receive notices required under this section by an electronic mail (e-mail) communication, if the agency makes such option available.

(o) Separate complaint. Nothing in this section shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed.

# Effective: March 10, 2015

DC ST § 38-2571.03

## § 38-2571.03. Procedural safeguards; due process requirements.

Currentness

In addition to any procedural safeguards and due process requirements required by IDEA:

(1) Before any change in service location for a child with a disability is made, the LEA shall provide the parent with written notice of the proposed change, which shall at minimum include:

(A) A description of the action proposed by the LEA;

(B) An explanation of why the LEA proposes to take the action;

(C) A description of each evaluation procedure, assessment, record, and report the agency used as a basis for the proposed action;

(D) A statement that the parents of a child with a disability have protection under the procedural safeguards of IDEA and that describes the means by which a copy of the procedural safeguards can be obtained;

(E) Sources for parents to contact to obtain assistance in understanding the provisions of IDEA;

(F) A description of other options that the LEA considered and the reasons why those options were rejected; and

(G) A description of any other factors relevant to the LEA's proposal.

(2) Any notice provided to the parent of a child with a disability or the parent of an infant or toddler with a disability pursuant to section 625(c)(1) or 639(a)(6) of IDEA (respectively, 20 U.S.C. § 1439(a)(6) and 20 U. S. C. § 1415(c)(1)) or this subchapter shall include a list of sources the parent may contact for assistance, including contact information for the:

(A) Parent Training and Information Center established pursuant to section 671 of IDEA (20 U.S.C. § 1471);

(B) Office of the Ombudsman for Public Education; and

(C) Office of the Student Advocate.

(3) No fewer than 5 business days before a scheduled meeting where an IEP, IFSP, or eligibility for special education services will be discussed, the public agency scheduling the meeting shall provide parents with an accessible copy of any evaluation, assessment, report, data chart, or other document that will be discussed at the meeting; provided, that if a meeting is scheduled fewer than 5 business days before it is to occur, then these documents shall be provided no fewer than 24 hours before the meeting.

(4)(A) No later than 5 business days after a meeting at which a new or amended IEP has been agreed upon, the public agency shall provide the parents with a copy of the IEP. If an IEP has not yet been completed by the 5th business day after the meeting or additional time is required to comply with subchapter II of Chapter 19 of Title 2, the public agency shall provide the parent with the latest available draft IEP and a final copy upon its completion; provided, that the final copy of the IEP shall be provided to the parents no later than 15 business days after the meeting at which the IEP was agreed upon.

(B) No later than 5 business days after a meeting at which a new or amended IFSP has been agreed upon, the public agency shall provide the parents with a copy of the IFSP for their review and signature. If additional time is required to comply with subchapter II of Chapter 19 of Title 2, the public agency shall provide the parent with a copy for parental review upon completion; provided, that the IFSP shall be provided to the parents for review no later than 15 business days after the meeting at which the IFSP was agreed upon.

(5)(A) Upon request, an LEA shall provide timely access, either together or separately, to the following for observing a child's current or proposed special educational program:

(i) The parent of a child with a disability; or

(ii) A designee appointed by the parent of a child with a disability who has professional expertise in the area of special education being observed or is necessary to facilitate an observation for a parent with a disability or to provide language translation assistance to a

parent; provided, that the designee is neither representing the parent's child in litigation related to the provision of free and appropriate public education for that child nor has a financial interest in the outcome of such litigation.

(B) The time allowed for a parent, or the parent's designee, to observe the child's program shall be of sufficient duration to enable the parent or designee to evaluate a child's performance in a current program or the ability of a proposed program to support the child.

(C) A parent, or the parent's designee, shall be allowed to view the child's instruction in the setting where it ordinarily occurs or the setting where the child's instruction will occur if the child attends the proposed program.

(D) The LEA shall not impose any conditions or restrictions on such observations except those necessary to:

(i) Ensure the safety of the children in a program;

(ii) Protect other children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or a designee; or

(iii) Avoid any potential disruption arising from multiple observations occurring in a classroom simultaneously.

(E) An observer shall not disclose nor use any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA.

(F) The LEA may require advance notice and may require the designation of a parent's observer to be in writing.

(G) Each LEA shall make its observation policy publicly available.

(H) Nothing in this paragraph shall be construed to limit or restrict any observational rights established by IDEA or other applicable law.

(6)(A) In special education due process hearings occurring pursuant to IDEA (20 U.S.C. § 1415(f) and 20 U.S.C. § 1439(a)(1)), the party who filed for the due process hearing shall bear the burden of production and the burden of persuasion; except, that:

(i) Where there is a dispute about the appropriateness of the child's individual educational program or placement, or of the program or placement proposed by the public agency, the public agency shall hold the burden of persuasion on the appropriateness of the existing or proposed program or placement; provided, that the party requesting the due process hearing shall retain the burden of production and shall establish a prima facie case before the burden of persuasion falls on the public agency. The burden of persuasion shall be met by a preponderance of the evidence.

(ii) Where a party seeks tuition reimbursement for unilateral placement, the party seeking reimbursement shall bear the burden of production and the burden of persuasion on the appropriateness of the unilateral placement; provided, that the hearing officer shall have the authority to bifurcate a hearing regarding a unilateral placement; provided further, that if the hearing officer determines that the program offered by the public agency is appropriate, it is not necessary to inquire into the appropriateness of the unilateral placement.

(B) This paragraph shall apply to special education due process hearings resulting from complaints filed after July 1, 2016.

(7)(A) In any action or proceeding brought under Part B or Part C of IDEA, a court, in its discretion, may award reasonable expert witness fees as part of the costs to a prevailing party:

(i) Who is the parent of a child with a disability;

(ii) That is a local educational agency or OSSE, when the attorney of a parent files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

(iii) That is a local educational agency or OSSE against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any

improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

(B) Any fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished; provided, that the maximum award shall be $6,000 per action or proceeding. No bonus or multiplier may be used in calculating the fees awarded under this paragraph.

(C) Expert witness fees otherwise available under this paragraph shall not be awarded if reimbursement of attorneys' fees and related costs would be prohibited in the proceeding under 20 U.S.C. § 1415(i)(3)(D).

(D) Any expert witness fees available under this paragraph, shall be subject to reduction if the court makes a finding listed under 20 U.S.C. 1415(i)(3)(F).

(E) Expert witness fees otherwise available under this paragraph shall not be awarded to compensate the moving party for an independent educational evaluation unless that party would be entitled to compensation for the evaluation under IDEA.

(F) This paragraph shall apply to actions and proceedings initiated after July 1, 2016.

## Effective: October 13, 2006

34 C.F.R. § 300.101

## § 300.101 Free appropriate public education (FAPE).

Currentness

(a) General. A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in § 300.530(d).

(b) FAPE for children beginning at age 3.

(1) Each State must ensure that—

(i) The obligation to make FAPE available to each eligible child residing in the State begins no later than the child's third birthday; and

(ii) An IEP or an IFSP is in effect for the child by that date, in accordance with § 300.323(b).

(2) If a child's third birthday occurs during the summer, the child's IEP Team shall determine the date when services under the IEP or IFSP will begin.

(c) Children advancing from grade to grade.

(1) Each State must ensure that FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade.

(2) The determination that a child described in paragraph (a) of this section is eligible under this part, must be made on an individual basis by the group responsible within the child's LEA for making eligibility determinations.

## Effective: October 13, 2006

34 C.F.R. § **300.116**

## § **300.116** Placements.

Currentness

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that—

(a) The placement decision—

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;

(b) The child's placement—

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

(c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

# Effective: October 13, 2006

34 C.F.R. § **300.325**

## § **300.325** Private school placements by public agencies.

Currentness

(a) Developing IEPs.

(1) Before a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child in accordance with §§ 300.320 and 300.324.

(2) The agency must ensure that a representative of the private school or facility attends the meeting. If the representative cannot attend, the agency must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls.

(b) Reviewing and revising IEPs.

(1) After a child with a disability enters a private school or facility, any meetings to review and revise the child's IEP may be initiated and conducted by the private school or facility at the discretion of the public agency.

(2) If the private school or facility initiates and conducts these meetings, the public agency must ensure that the parents and an agency representative—

(i) Are involved in any decision about the child's IEP; and

(ii) Agree to any proposed changes in the IEP before those changes are implemented.

(c) Responsibility. Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the SEA.

# Effective: December 31, 2008

## 34 C.F.R. § 300.512

## § 300.512 Hearing rights.

Currentness

(a) General. Any party to a hearing conducted pursuant to §§ 300.507 through 300.513 or §§ 300.530 through 300.534, or an appeal conducted pursuant to § 300.514, has the right to—

(1) Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities, except that whether parties have the right to be represented by non-attorneys at due process hearings is determined under State law;

(2) Present evidence and confront, cross-examine, and compel the attendance of witnesses;

(3) Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing;

(4) Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and

(5) Obtain written, or, at the option of the parents, electronic findings of fact and decisions.

(b) Additional disclosure of information.

(1) At least five business days prior to a hearing conducted pursuant to § 300.511(a), each party must disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing.

(2) A hearing officer may bar any party that fails to comply with paragraph (b)(1) of this section from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

(c) Parental rights at hearings. Parents involved in hearings must be given the right to—

(1) Have the child who is the subject of the hearing present;

(2) Open the hearing to the public; and

(3) Have the record of the hearing and the findings of fact and decisions described in paragraphs (a)(4) and (a)(5) of this section provided at no cost to parents.

Federal Rules of Evidence Rule 401, 28 U.S.C.A.

## Rule 401. Test for Relevant Evidence

[Currentness]

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.